[Civ. No. 27935. Fourth Dist., Div. Two. Mar. 16, 1983.]

H. R. KAUFMAN, Plaintiff and Appellant, v.
FIDELITY FEDERAL SAVINGS AND LOAN ASSOCIATION et al.,
Defendants and Respondents.

914

**COUNSEL**

Ron R. Goldie and Richard A. Granowitz for Plaintiff and Appellant.

Leff & Stephenson, Andrew E. Katz and Steven G. Polard for Defendant and Respondents.

**OPINION**

**RICKLES, J.**—Plaintiff appeals from a summary judgment against him in an action for libel based on a letter written by defendants during the course of a zoning dispute.

## FACTS

Blue Jay Village, perched in the San Bernardino mountains, was the setting for this libel action. Defendant Fidelity Federal Savings and Loan Association felt the need to expand in order to better serve this community. A dispute arose

as to whether such expansion was in the best interests of Blue Jay. During the course of hearings by the board of supervisors to determine the propriety of the expansion, Fidelity wrote the local residents seeking their support. Plaintiff H. R. Kaufman asserts he was defamed by this letter.

Fidelity has been a tenant of Kaufman's Blue Jay Village Corporation in the Village of Blue Jay for a number of years. Kaufman is the President of the Blue Jay Village Corporation which is the wholly owned subsidiary of Pioneer Take-Out Chicken Corporation. Kaufman is also the president and controlling stockholder of Pioneer Chicken.

Blue Jay Village was the only commercial property properly zoned for a savings and loan establishment. For a time the two savings and loans (Fidelity and Arrowhead Savings and Loan Association) have both been located in the village. Kaufman helped organize Arrowhead and is presently chairman of the board. Arrowhead leases and occupies a rather large free-standing building in Blue Jay Village.

In contrast, defendant Fidelity Federal Savings and Loan Association was leasing a significantly smaller space from the Blue Jay Village Corporation. During 1979 and prior thereto, defendant was negotiating for larger quarters with plaintiff's Blue Jay Village Corporation. These negotiations ultimately broke down and defendant purchased property adjacent to that owned by the Blue Jay Village Corporation. Defendant intended to construct a building to house its savings and loan on this property.

The property was not properly zoned for a professional building. In 1979, defendant commenced proceedings to have the property rezoned to allow it to carry out its plans for building.

These efforts were sporadically reported in the press until late 1980. After that time the dispute concerning Fidelity's plans came to a head. Community interest increased which resulted in more detailed press coverage. On September 18, 1980, the zone change was approved and reported in the Mountain News & Mountaineer and the Timberline Journal. These are both weekly newspapers of general circulation distributed in the Arrowhead and Blue Jay areas. The Mountain News on October 2, 1980, reported the zone change had been referred back to the planning commission based on improper notice of the hearing. The Timberline Journal published the same story on October 9, 1980. The zone change was approved on October 14, 1980, by the planning commission. This was reported in the Timberline Journal on October 16, 1980. These words appear in that article: "Frank Wilson, who filed the original appeal, did not appear, however, Ron Goldie, the attorney representing Pioneer Take-Out Corporation, owners of Blue Jay Village, did oppose the project." The ap-

proval of the zone change by the planning commission was also reported in the Mountain News on October 16, 1980. The article stated in part: "Tuesday's hearing brought opposition in the person of Ron Goldie, representing Blue Jay Village, a subsidiary of Pioneer Takeout, Inc., who contended that the Fidelity Federal plan would upset the overall plan for Blue Jay Village."

The controversy continued when the board of supervisors set a new hearing date (November 10, 1980); reported in the Mountain News on October 23, 1980. On October 30, 1980, the Mountain News carried this headline story on the front page: "FIDELITY ZONE CHANGE RUNS INTO MORE SNAGS." Contained within this article was the following: "[T]he objecting property owner failed to show up at the commission's rehearing hearing and the commission reaffirmed its previous actions. [¶] However, Ron Goldie, representing Pioneer Chicken's Blue Jay Village corporation, did make an appearance to object to the project as out of phase with the master plan for the Blue Jay area and extending commercial zoning too far from the downtown area. [¶] When the commission failed to heed his complaints and took its reaffirmation action, Goldie filed his own appeal to the board to 'reverse Planning commission action and return the matter to the commission to adopt planning department staff recommendations for denial of application.'" On October 30, 1980, the Timberline Journal carried the story of the resetting of Fidelity Savings and Loan's application for hearing on the zone change to November 10, 1980. These words appear in that article: "In an apparent attempt to block the zone change of the Lester Jacobsen property on North Bay Road, Ron Goldie of the Goldie Law Corporation, on behalf of Pioneer Take Out Corporation has filed an appeal before the San Bernardino County Board of Supervisors. [¶] The rezoning would allow the transfer of the property to Fidelity Savings and Loan for construction of a new branch office in Blue Jay Village."

On November 6, 1980, the Timberline Journal, under the heading "Fidelity site stalled, again" published a story containing the following: "Monday, Attorney Ray Goldie, representing the Blue Jay Village consortium owned by H.R. (Rick) Kaufmann asked the supervisors to grant a continuance until the revised environmental impact review is made public and how it would affect the proposed zone change . . . [¶] One proponent of the zone change described the delaying tactics as being an attempt to monopolize the area. He said, 'The problem is that they (the corporate owners of Blue Jay) simply don't want any commercial enterprise competing with their commercial property.'" On November 13, 1980, Mountain News carried this story covering the continuance of the zoning change, stating: ". . . Ron Goldie, representing Blue Jay Village, Inc., filed a second appeal, having told the planners on Oct. 14 that the Fidelity Federal project is not in line with the overall plan for Blue Jay. He added that as a representative of Lake Arrowhead Property Owners association he objects because, he contended, the plan violates the CC and Rs for Arrowhead

Woods. . . . [¶] Also in attendance Monday was Frank Wilson, a neighboring property owner who filed the original appeal. He came from Los Angeles to tell the board that he no longer objects to the Fidelity Federal proposal. The firm's attorney, Walt Blackwell, was also in attendance.''

Against this backdrop, defendant sent the following letter to the local residents:

"Dear Mr. and Mrs. . . .

"Fidelity Federal Savings and Loan Association has served your community in the Blue Jay area since 1972. For several years we have attempted to relocate to larger quarters in Blue Jay in order to better serve our many valued customers. That attempt to relocate has been resisted at every turn by a controlling party of Blue Jay Village, who is a controlling party of Pioneer· Chicken, and who is one of the organizers of Arrowhead Savings and Loan. He is able to do this because the only property properly zoned for a savings and loan is owned by Blue Jay Village.

"Our Association has now agreed to acquire a parcel located just north of Blue Jay Village on North Bay road. The proposed community plan would allow the construction of a new branch. However, the zoning must be changed.

"The man who controls Blue Jay Village has exerted a great deal of political pressure to convince the Supervisors to refuse the zoning change. If you would like Fidelity Federal to continue to do business in the Blue Jay area, this is your opportunity to make your feelings known.

"If you wish to allow one man to decide which savings and loan association you will be allowed to patronize in the Blue Jay area, disregard this letter. But, if his attempt makes you mad, sign the enclosed postcards and mail them to your Supervisors *today.*

"You must mail the postcards today to make your feelings known because the Supervisors have agreed to decide this matter on November 24, 1980.

"Hurry and mail the postcards.

"Very truly yours,

"[s] Walter L. Blackwell, III
"WALTER L. BLACKWELL, III
"Senior Vice President"

This letter was mailed on November 12, 1980.

Plaintiff instituted the present suit for libel based on this letter.

These facts are not contradicted by anything contained in plaintiff's affidavits in opposition to the motion for summary judgment.

The defendant filed a motion for summary judgment claiming the letter constituted opinion rather than fact as a matter of law. The court below granted the motion on two grounds: The statements were nonactionable opinions and conclusions of the defendant; the statements were nondefamatory as a matter of law.

## DISCUSSION

■ Does the questioned letter contain opinion or fact? This is a matter of law and summary judgment is a favored remedy to resolve cases concerning First Amendment rights. The chilling effect of protracted litigation on the exercise of free speech requires speedy resolution. (*Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 685 [150 Cal.Rptr. 258, 586 P.2d 572].) "[T]he question of issue finding is to be determined by the sufficiency of the affidavits of the parties. [Citations.] Where on a motion for summary judgment the issues are of law only it is the duty of the trial court to determine those issues. [Citations.]" (*Doyle* v. *Hibernia Bank* (1957) 156 Cal.App.2d 16, 20 [319 P.2d 412].)

■ In tort law, it is well settled that only a false statement of fact can be actionable in libel or slander. However, the resolution of this case requires a constitutional analysis as well. The plaintiff voluntarily joined in the political process in an attempt to influence a resolution of a zoning issue. This issue was a matter of public interest, and therefore the publication of this letter is protected by the First Amendment.

■ If the First Amendment stands for anything at all, it guarantees that debates on political issues of the day will remain uninhibited, robust and wide open. (*Gertz* v. *Welch* (1974) 418 U.S. 323, 339-340 [41 L.Ed.2d 789, 804-805, 94 S.Ct. 2997].) This constitutional safeguard was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes. (*Roth* v. *United States* (1957) 354 U.S. 476, 484 [1 L.Ed.2d 1498, 1506, 77 S.Ct. 1304].) Consequently, speech which arises directly from political debates—i.e., that which is at the heart of the First Amendment—is entitled to greater protection. In fact, First Amendment protection extends even to some nontruths in order to protect speech that matters. (*Gertz* v. *Welch, supra,* at p. 341 [41 L.Ed.2d at p. 806].) Were this not the case, the political discussion would be hampered by self-censorship.

In order to implement the First Amendment theme, the United States Supreme Court has established various guidelines. In defamation law, courts now must identify the plaintiff as either a public figure or private individual. Persons who have assumed roles of prominence in society or those who have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," are required to meet a higher standard for recovery than private individuals. (*Gertz* v. *Welch, supra,* at p. 345 [4 L.Ed.2d at p. 808].) The public figure has chosen to step into the limelight and therefore runs the risk of closer public scrutiny. Undoubtedly, the public figure will also have easier access to the media in order to combat any defamatory statement which may have been made. In contrast the private individual has no comparable access, is potentially more vulnerable to injury, and is therefore "more deserving of recovery." (*Id.*)

With this First Amendment theme and defamation guideline in mind, we now return to the particular facts of this case. In considering the motion for summary judgment the trial court was required to determine if defendant's statement was fact or opinion. By granting the motion the court chose the latter. We agree.

The critical determination of whether the alleged defamatory statement constitutes fact or opinion is a question of law. This distinction frequently is a difficult one and what constitutes a statement of fact in one context may be treated as a statement of opinion in another. (*Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601 [131 Cal.Rptr. 641, 552 P.2d 425].) The totality of the circumstances under which the statement is made and the status of the plaintiff should be taken into consideration by the court in making this determination. What might be considered a statement of fact as to a private individual may be considered as a statement of an opinion as to a public figure.

As we earlier noted the alleged defamatory statement arose while the parties were engaged in the political process of influencing zoning officials. The press coverage reveals a see-saw battle—one in which the victor would realize business and no doubt financial gains. Nevertheless, the public had a keen interest in the zoning resolution, especially in this small community. We find this publicized letter sought to convey pertinent information to an interested public. Opinions or criticisms are not libelous if they clearly go only to the merits or demerits of a condition, cause or controversy which is under public scrutiny. (*Howard* v. *Southern Cal. etc. Newspapers* (1950) 95 Cal.App.2d 580, 584 [213 P.2d 399], disapproved on another point in *Field Research Corp.* v. *Superior Court* (1969) 71 Cal.2d 110 [77 Cal.Rptr. 243, 453 P.2d 747].) Here, defendant was met with opposition to his attempt to acquire zone changes. The letter merely sheds light on these circumstances and, in the form of opinion, criticizes plaintiff's tactics. This finding comports with the above-discussed First Amendment theme.

Our Supreme Court requires that in distinguishing opinion from fact we consider the context in which the statement was made. Therefore, plaintiff's status becomes relevant. Did plaintiff's voluntary entrance into the fray make him a public figure for this limited purpose? It did.

Plaintiff's activities in this case fit the definition of a "Public Figure" under ordinary tort rules as set forth in *Gertz* v. *Welch, supra,* 418 U.S. 323, 345 [41 L.Ed.2d 789, 808]: "[I]t may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event they invite attention and comment." Plaintiff, by voluntarily injecting himself into the zoning dispute, must accept the necessary consequences of that involvement in public affairs.

Defendant's letter in this case did just that. It directed the attention of the recipients of the letter to the matter in controversy and to the role plaintiff played therein as defendant saw it.

Plaintiff's status as a limited public figure suggests he is not entitled, with respect to this zoning dispute, to the protections accorded to a private individual. We are therefore persuaded this letter contained no actionable factual assertions.

Finally, we find *Okun* v. *Superior Court* (1981) 29 Cal.3d 442 [175 Cal.Rptr. 157, 629 P.2d 1369], directly supports our conclusion. There, plaintiff acquired property to build condominiums. This property was under a building moratorium pending determination of zoning adjoined city-owned parcels. Plaintiff and city negotiated a land exchange agreement which included the city's council's passing a zoning ordinance (benefiting plaintiff). Defendants however forced the ordinance to the ballot where it was rejected. Defendants, during their campaign, sent a letter to the newspaper which became the subject of the libel action. Plaintiff alleged by way of innuendo the letter was understood to mean he conspired with the mayor to commit bribery and corruption.

In finding the letter was opinion, the court stated: ". . . [W]here potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyper-

bole, language which generally might be considered as statements of fact may well assume the character of statements of opinion." (*Okun* v. *Superior Court, supra,* 29 Cal.3d at 450-451.)

In the case at bar, the letter does not accuse plaintiff of either crime or dishonesty. The complaint fails to specify how, by innuendo or otherwise, the letter was defamatory in nature; only conclusory statements of reputation harm are made.

## CONCLUSION

The letter contains defendant's opinion plaintiff was resisting and opposing the zone change and engaging in the political process in doing so. Defendant opines plaintiff has exerted a great deal of political pressure on the board of supervisors to convince them to refuse the zone change sought by defendant. This opinion is a legitimate one as one normally expects political pressure to be applied to political matters. The defendant's letter, when viewed in the totality of the circumstances in this case, constitutes statements of opinion rather than fact and as a matter of law is entitled to First Amendment protection. The summary judgment was properly granted on the first ground stated by the trial judge and we need not discuss the second ground.

The judgment is affirmed.

Morris, P. J., and McDaniel, J., concurred.