Opinion
 

 FRANSON, J.
 
 *
 

 Statement of the Case
 

 This is the second appeal from a summary judgment in plaintiff Paul S. Mosesian’s defamation action against defendants McClatchy Newspapers, Frank McCulloch, Denny Walsh, Jerry Bier and James McClung.
 
 [1]
 
 In
 
 Mosesian
 
 v.
 
 McClatchy Newspapers
 
 (1988) 205 Cal.App.3d 597 [252 Cal.Rptr. 586]
 
 (Mosesian
 
 I) this court addressed the question of whether plaintiff was a “public official” as a matter of law and would therefore have to prove actual malice to recover damages from defendant. We held plaintiff was not a public official as a matter of law; however, we did not resolve the question whether plaintiff was a “public figure,” which also requires proof of actual
 
 *1105
 
 malice as a predicate for damages. This question was left for further proceedings upon remand.
 
 (Id.
 
 at p. 611.)
 
 Mosesian I
 
 also held no reasonable jury could find actual malice. Thus, if it were to be determined in further proceedings plaintiff was a public figure, he would be unable to recover damages for defamation, and defendants would be entitled to judgment.
 

 The United States Supreme Court has defined two categories of public figures for First Amendment analysis. First, the “all purpose” public figure who has “achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.” The second category is the “limited purpose” or “vortex” public figure, an individual who “voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.”
 
 (Gertz
 
 v.
 
 Robert Welch, Inc.
 
 (1974) 418 U.S. 323, 351 [41 L.Ed.2d 789, 812, 94 S.Ct. 2997].)
 

 The trial court on remand ruled there were triable issues of fact on the question whether plaintiff was a public figure for “all purposes”; however, it concluded as a matter of law plaintiff was a public figure for the limited purpose of the public controversy which had arisen over plaintiff’s qualifications to be licensed, through Calfax Racing Association (Calfax), for horse racing in Fresno.
 

 Because plaintiff would be unable to prove actual malice on the defendant’s part in publishing the allegedly defamatory articles, the libel action had to be dismissed.
 

 For the reasons to be explained, we hold the trial court properly found plaintiff to be a limited purpose public figure; hence, the judgment will be affirmed.
 

 Discussion
 

 A.
 
 The Public Controversy
 

 The following description of the public controversy which preceded the publication of the defendant’s allegedly defamatory articles about plaintiff is taken from photocopies of 31 newspaper articles published in the Fresno Bee between August 1979 and November 1980. The articles are attached as exhibits to defendant’s motion for summary judgment and are part of the record before us. Many of the articles, appearing under bold headlines and prominently displayed, presumably were read by many people in the Fresno community, and also presumably were the basis of numerous radio and
 
 *1106
 
 television news commentaries throughout the San Joaquin Valley. We are not concerned with the truth or falsity of the hearsay contents of the articles but only their relevance to the question of whether plaintiff attained the position of a “public figure” in connection with the disputes involving the licensing of his company, Calfax, to conduct horse racing.
 

 In 1976 Governor Edmund G. Brown, Jr., vetoed a bill to authorize spring horse racing in Fresno due to a lack of community support. Two years later the bill was reintroduced by then Assemblyman Ken Maddy, an avid horse racing fan, and the Governor signed the bill into law. Thus, the stage was set for Fresno to embark on the first spring horse racing meet in its history.
 

 Plaintiff was the president, one of three corporate directors and one of three shareholders in Equestra Corporation which owned Calfax. Plaintiff also was the legal representative and the principal spokesperson for Calfax during the licensing process hereinafter described. He also became the general manager of the 1980 spring race meet.
 

 The first spring meet was scheduled to be held at the Fresno Fairgrounds in 1980. Mosesian’s company, Calfax, was one of two bidders for a contract to lease the Fresno Fairgrounds, a prerequisite to obtaining a license from the California Horse Racing Board (the CHRB) to conduct the meet. The other bid was submitted by the Fresno Horse Racing Association (the FHRA), whose president was Fresno County Supervisor Harry Huey. Because Calfax submitted a bid higher than FHRA, Calfax was selected by the fair board directors to receive the contract, subject to licensing by the CHRB.
 

 Supervisor Huey publicly protested on behalf of his group that Calfax was ineligible to bid on the lease because it was not incorporated as required by contract specifications. As a result of this dispute, the fair board directors suspended the contract with Calfax and sent both the Calfax and FHRA bids to the California Attorney General’s office for an evaluation of their legality. Mosesian protested publicly, claiming the fair board “had the right to waive irregularities, defects and informalities and in effect did waive those things by their . . . vote” in selecting Calfax. Mosesian also claimed in the press that Vem Higdon, secretary-manager of the 21st District Agricultural Association, told him Calfax did not need to be incorporated until it was awarded the contract. Higdon publicly denied Mosesian’s contention.
 

 Responding to questions from the press, fair board director Besley Lewis, Jr., characterized the dispute as to who would receive the contract as a
 
 *1107
 
 “political ball game,” and noted the fair board had received “a lot of phone calls from a lot of legislators” after Calfax was selected.
 

 Two weeks later, on the advice of the California Department of Food and Agriculture, the fair board directors took the contract away from Calfax and awarded it to FHRA on the ground that Calfax was not legally incorporated at the time its bid was submitted.
 

 Mosesian, who had made an appearance before the fair board directors at their public meeting, criticized the decision and accused them of “collusion.” As the Bee reported the next day under a headline entitled, “Spring horse racing switch: Huey group gets it,” “Over angry accusations of ‘collusion,’ ” Fresno lawyer Paul Mosesian stated, “ ‘It seems to me that I’m fighting a shadow, . . . I’m fighting this big, black shadow and I don’t know what it
 

 On September 20,1979, two days after the fair board’s decision, Mosesian and Calfax filed a lawsuit in the Fresno superior court against the fair board directors, FHRA, the California Department of Food and Agriculture, and other state and county officials, seeking a temporary restraining order to prevent the fair board from awarding the contract to FHRA. Mosesian’s suit contended the defendants had “entered into a conspiracy” to break the Calfax contract award.
 

 Mosesian and Huey then made public appearances before the CHRB to argue their respective positions. CHRB members were apparently unaware they were defendants in Mosesian’s lawsuit because, at the meeting, FHRA Attorney Klein reportedly “drew chuckles from board members” when he mentioned Mosesian had charged them with conspiracy.
 

 On October 14, 1979, the fair board directors decided to set aside all prior proposals submitted for the spring meet and to reopen the bidding process under sealed bids. Calfax’s bid again was the highest, and Calfax again was awarded the lease for the 1980 spring meet, subject to a license from the CHRB. Supervisor Huey was quoted in the Bee as conceding the lease award to Calfax, which he characterized as “preordained.”
 

 In January 1980, two articles were published in the Bee which described Calfax’s application to the CHRB for a license to conduct the spring meet, and which also discussed Calfax’s plans for the meet. Mosesian, who was interviewed in one of the articles, claimed he was confident the CHRB would approve of Calfax, and asserted there was a good chance his request for the race dates of May 3 to 31 would be granted. One of Mosesian’s proposals was to hold horse racing on Sundays, which had never been done
 
 *1108
 
 in Fresno. However, in the interview, Mosesian stated it had yet to be decided whether there would be Sunday racing.
 

 The CHRB, which oversees all pari-mutuel racing in the state, held a public meeting in January 1980 to decide whether to approve Calfax’s license application. At the meeting, the CHRB appeared reluctant to approve the application until Mosesian told the three CHRB members that his group’s “credibility would be hurt” in Fresno if no action was taken. The members questioned Calfax’s financial statement, lack of named personnel in its application, and the makeup of the proposed race cards. A final hearing on Calfax’s application was scheduled for February 15, 1980.
 

 The following week a new group, the Valley Racing Association, announced it would compete with Calfax for the license before the CHRB. Mosesian, in an interview after the announcement by the rival group, said he was confident Calfax would still be awarded the license. Less than two weeks before the final license hearing was held, Mosesian called a press conference in his law office to introduce Calfax’s top management personnel who were to operate the meet. When the license hearing was convened on February 15, no action could be taken because the CHRB lacked a quorum. However, this public meeting became a heated discussion when two other groups said they would vie for the license, and two horsemen’s groups—the Pacific Coast Quarterhorse Racing Association and the California Arabian Horse Board—objected to Calfax’s license application.
 

 Plaintiff addressed these problems at a public meeting of the fair board directors in Fresno a few weeks later. He said Calfax had reached an “oral understanding” with the mixed-breed horsemen’s association that might want to participate in the meet. He said Calfax was working out “labor problems” with various labor organizations which were to staff the meet.
 

 On March 1,1980, the CHRB awarded Calfax a license to conduct spring horse racing in Fresno. The article covering the announcement stated that necessary accords had been reached with labor organizations and horsemen’s associations. Plaintiff was interviewed for the article. He was quoted as stating that he was “in an unusual position [of being] the first person in the state” to conduct such a meet and that he was under a great deal of pressure. He also stated that a survey reflected an “overwhelming number of people in Fresno favor Sunday racing.” In his opinion, “Sunday will be a big day for racing in Fresno, maybe even bigger than Saturday.”
 

 A press article on April 24, 1980, stated that Calfax had denied the local 4-H Club the use of the fairground facilities for its annual fair during the 21-day horse racing event because the lease allowed Calfax exclusive use of
 
 *1109
 
 the facilities. An article the following day reflected an agreement had been reached and the 4-H Club would be allowed to use the grounds for its event.
 

 A commentary published in the Bee May 1, 1980, discussed the fact that the First Armenian Presbyterian Church had cancelled its plans to use the fairgrounds for its annual picnic because the church opposed Sunday racing. Plaintiff was chided in the article for making a bad public relations move in conducting Sunday racing.
 

 The plaintiff made various attendance and wagering predictions for the meet which were widely reported in the press. He later admitted his predictions were overly optimistic and part of his promotion “hype.”
 

 The Bee provided daily coverage of the spring horse racing event. Although it was initially reported that attendance at the event was disappointing, by the end of the meet, after lowering ticket prices, reports indicated the meet was quite successful. Immediately after the meet, plaintiff announced Calfax would seek to renew its license for the following year.
 

 Thereafter, for approximately five and one-half months, the press was silent about Mosesian, Calfax, or spring horse racing in Fresno. However, on November 14, 1980, the Bee published the first of several allegedly defamatory articles about Mosesian and his personal qualifications to be involved in horse racing. The article reported an investigation by the CHRB into irregularities in the handling of funds in connection with the 1980 spring horse racing meet and a further investigation of plaintiff’s background. According to the article, the new investigation was based upon information provided by Bee reporters which reflected the initial investigation was not thorough. It also was reported that state files indicated plaintiff may have been involved in illegal gambling and may have associated with known bookmakers, prostitutes and organized crime figures.
 

 That same afternoon, plaintiff held a press conference to respond to the article. He denied the allegations and announced that he would seek criminal sanctions for “malicious slander” against the Bee and the reporters responsible for the article. His statements were included in an article in the Bee the next day.
 

 B.
 
 Constitutional Framework for Analysis
 

 Speech on matters of public concern is at the heart of the First Amendment.
 
 (First National Bank of Boston
 
 v.
 
 Bellotti
 
 (1978) 435 U.S. 765, 776 [55 L.Ed.2d 707, 717, 98 S.Ct. 1407].) Freedom of expression upon public questions and debate upon public issues should be “uninhibited,
 
 *1110
 
 robust, and wide-open” even though “it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.”
 
 (New York Times Co.
 
 v.
 
 Sullivan
 
 (1964) 376 U.S. 254, 270 [11 L.Ed.2d 686, 701, 84 S.Ct. 710, 95 A.L.R.2d 1412].) It is a fundamental constitutional principle that the press must be free to “ . . canvass[ ] the merits and measures of public men, of every description, . . ”
 
 (Id.
 
 at p. 275 [11 L.Ed.2d at p. 703].) For this reason, in order to recover damages for a defamatory falsehood relating to his official conduct, a public official must prove the statement was made with knowledge that it was false or with reckless disregard of whether it was true or false.
 
 (Id.
 
 at p. 280 [11 L.Ed.2d at p. 706].) “[E]rroneous statement is inevitable in free debate, . . . [yet] it must be protected if the freedoms of expression are to have the ‘breathing space’that they‘need . . . to survive,’. . .”
 
 (Id.
 
 at pp. 271-272 [11 L.Ed.2d at p. 701].)
 

 Speech on matters of purely private concern is of less First Amendment concern.
 
 (Connick
 
 v.
 
 Myers
 
 (1983) 461 U.S. 138, 146-147 [75 L.Ed.2d 708, 719-720, 103 S.Ct. 1684].) When the libelous statement relates to a matter which is not of public concern, the plaintiff is not required to prove actual malice.
 
 (Dun & Bradstreet, Inc.
 
 v.
 
 Greenmoss Builders
 
 (1985) 472 U.S. 749, 761 [86 L.Ed.2d 593, 603-604, 105 S.Ct. 2939].) Whether speech addresses a matter of public concern depends upon its content, form and context as revealed by the whole record.
 
 (Connick
 
 v.
 
 Myers, supra,
 
 at pp. 147-148 [75 L.Ed.2d at p. 720].)
 

 Nevertheless, even when speech involves a matter of public concern, defamation plaintiffs who are private individuals need not prove actual malice.
 
 (Gertz
 
 v.
 
 Robert Welch, Inc., supra,
 
 418 U.S. at pp. 344-345 [41 L.Ed.2d at p. 808].) Unlike public officials or public figures, private individuals have not voluntarily exposed themselves to an increased risk of injury from defamatory statements and generally lack effective opportunities for rebutting such statements.
 
 (Ibid.)
 

 Three types of defamation plaintiffs have been identified who must prove actual malice when defamatory speech relates to a matter of public concern—the public official, the general purpose public figure and the limited purpose public figure.
 
 (Gertz
 
 v.
 
 Robert Welch, Inc., supra,
 
 418 U.S. at p. 351 [41 L.Ed.2d at p. 812].) Whether a plaintiff is a public official or public figure is in the first instance a question of law for the trial court to decide.
 
 (Reader’s Digest Assn.
 
 v.
 
 Superior Court
 
 (1984) 37 Cal.3d 244, 252 [208 Cal.Rptr. 137, 690 P.2d 610].)
 

 C.
 
 Limited Purpose Public Figure
 

 In companion cases,
 
 Curtis Publishing Co.
 
 v.
 
 Butts
 
 and
 
 Associated Press
 
 v.
 
 Walker,
 
 the Supreme Court first discussed the public figure concept.
 
 (Curtis
 
 
 *1111
 

 Publishing Co.
 
 v.
 
 Butts
 
 (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975].) Butts, the athletic director of the University of Georgia, was accused in a publication of conspiring to fix a football game between the University of Georgia and the University of Alabama. Walker, a retired military man, was accused in a publication of instigating a riot on the campus of the University of Mississippi when federal agents attempted to enforce an order allowing a Black student to attend the university.
 

 The question before the court was whether the rule announced in
 
 New York Times Co.
 
 v.
 
 Sullivan, supra,
 
 376 U.S. 254, requiring a public official to prove actual malice on the part of a publisher in order to recover damages for a defamation, should be extended to plaintiffs such as Butts and Walker.
 

 “[I]n formulating the standards for determining the degree of care to be expected in the circumstances, courts have consistently given much attention to the importance of defendants’ activities. [Citation.] The courts have also, especially in libel cases, investigated the plaintiff’s position to determine whether he has a legitimate call upon the court for protection in light of his prior activities and means of self-defense. [Citations.] We note that the public interest in the circulation of the materials here involved, and the publisher’s interest in circulating them, is not less than that involved in
 
 New York Times.
 
 And both Butts and Walker commanded a substantial amount of independent public interest at the time of the publications; both, in our opinion, would have been labeled ‘public figures’ under ordinary tort rules. [Citation.] Butts may have attained that status by position alone and Walker by
 
 his purposeful activity amounting to a thrusting of his personality into the ‘vortex’ of an important public controversy,
 
 but both commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able ‘to expose through discussion the falsehood and fallacies’ of the defamatory statements. [Citation.]”
 
 (Curtis Publishing Co.
 
 v.
 
 Butts, supra,
 
 388 U.S. at pp. 154-155 [18 L.Ed.2d at pp. 1110-1111], italics added.)
 

 The rule of
 
 New York Times
 
 requiring proof of malice in order to recover damages for defamation was thereby extended to public figure plaintiffs.
 

 Thereafter, in
 
 Rosenbloom
 
 v.
 
 Metromedia
 
 (1971) 403 U.S. 29 [29 L.Ed.2d 296, 91 S.Ct. 1811], a plurality opinion extended the First Amendment privilege requiring proof of malice to speech on all matters of public concern. The question of whether malice was required, according to
 
 Rosenbloom,
 
 depended upon “whether the utterance involved concern[ed] an issue of public or general concern, . . .”
 
 (Id.
 
 at p. 44 [29 L.Ed.2d at p. 312].)
 
 Rosenbloom
 
 left to future cases to delineate the reach of the term “issue of public or general concern.”
 
 (Id.
 
 at pp. 44-45 [29 L.Ed.2d at p. 312].)
 

 
 *1112
 
 The court subsequently rejected the reasoning of the
 
 Rosenbloom
 
 plurality in
 
 Gertz
 
 v.
 
 Robert Welch, Inc., supra,
 
 418 U.S. 323. The
 
 Gertz
 
 court refused to accept that the actual malice standard applied to cases concerning all discussion and communication involving matters of public or general concern regardless of whether the plaintiff was a private individual or public individual.
 
 (Id.
 
 at pp. 334, 344-346 [41 L.Ed.2d at pp. 807-809].)
 

 Gertz was a prominent Chicago attorney who represented the family of a young man who was shot by a policeman in a civil action against the policeman for damages. In a John Birch Society publication, Gertz was accused of participating in a communist conspiracy to discredit law enforcement. The civil suit against the policeman accused of shooting the young man was claimed in the article to be a part of the conspiracy. Gertz sued for libel, and the defendant invoked the privilege of
 
 New York Times
 
 v.
 
 Sullivan.
 

 Gertz
 
 characterized the holding in
 
 Curtis Publishing Co
 
 v.
 
 Butts, supra,
 
 388 U.S. 130, as extending the
 
 New York Times
 
 rule to “protect defamatory criticism of nonpublic persons who ‘are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.’ ” (418 U.S. at p. 337 [41 L.Ed.2d at p. 803], quoting cone. opn. of Warren, C. J„ in
 
 Curtis
 
 and
 
 Walker
 
 cases, 388 U.S. at p. 164 [18 L.Ed.2d at p. 1116].) The
 
 Gertz
 
 court recognized the tension between “the need for a vigorous and uninhibited press” and “the legitimate interest” in the “ ‘. . . protection of private personality ....’” (418 U.S. at pp. 341-342 [41 L.Ed.2d at p. 806].) The
 
 Rosenbloom
 
 plurality approached the task of defining a proper balance between these competing interests in terms of the matters about which the allegedly libelous remarks were concerned—i.e., whether they addressed issues of general or public interest. The
 
 Gertz
 
 court rejected that approach and instead focused upon the individual plaintiff’s identity and status—i.e., whether the plaintiff was a public official/figure or a private individual. (418 U.S. at pp. 344-346 [41 L.Ed.2d at pp. 807-809].)
 

 The rationale for the distinction between a public official and private person was that the public official had more access to the media for self-help in order to correct the error or to contradict the lie. Additionally, those who seek governmental office are deemed to have accepted the risk of closer public scrutiny. The court stated a similar rationale for the public figure plaintiff.
 

 
 *1113
 
 “Those classed as public figures stand in a similar position. Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have
 
 thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.
 
 In either event, they invite attention and comment.”
 
 (Gertz
 
 v.
 
 Robert Welch, Inc., supra,
 
 418 U.S. at p. 345 [41 L.Ed.2d at p. 808], italics added.)
 

 A private individual, on the other hand, cannot be deemed to have assumed the same risk.
 

 “Even if the foregoing generalities do not obtain in every instance, the communications media are entitled to act on the assumption that public officials and
 
 public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them. No such assumption is justified with respect to a private individual. He has not accepted public office or assumed an ‘influential role in ordering society.’ Curtis Publishing Co.
 
 v.
 
 Butts,
 
 388 U.S., at 164 (Warren, C. J., concurring in result). He has relinquished no part of his interest in the protection of his own good name, and consequently he has a more compelling call on the courts for redress of injury inflicted by defamatory falsehood. Thus, private individuals are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery.” (418 U.S. at p. 345 [41 L.Ed.2d at p. 808], italics added.)
 

 The court rejected offhand the claim that Gertz was a public official because he had served briefly on housing committees as a result of appointment by the mayor or because he attended the coroner’s inquest into the death of the young man whose family Gertz was representing in a civil action.
 

 It likewise rejected the claim that Gertz was a general purpose public figure.
 

 His status as a “limited purpose public figure” was then assessed:
 

 “It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual’s participation in the particular controversy giving rise to the defamation.
 

 
 *1114
 
 “In this context it is plain that petitioner was not a public figure. He played a minimal role at the coroner’s inquest, and his participation related solely to his representation of a private client. He took no part in the criminal prosecution of Officer Nuccio. Moreover, he never discussed either the criminal or civil litigation with the press and was never quoted as having done so. He plainly did not thrust himself into the vortex of this public issue, nor did he engage the public’s attention in an attempt to influence its outcome. We are persuaded that the trial court did not err in refusing to characterize petitioner as a public figure for the purpose of this litigation.” (418 U.S. at p. 352 [41 L.Ed.2d at p. 812].)
 

 In
 
 Wolston
 
 v.
 
 Reader’s Digest Assn., Inc.
 
 (1979) 443 U.S. 157 [61 L.Ed.2d 450, 99 S.Ct. 2701], an article published in 1974 identified the plaintiff as a Soviet agent. The defendant claimed the plaintiff was a public figure as a result of his 1958 conviction for contempt of court for failing to respond to a subpoena from a grand jury investigating his involvement in Soviet espionage. According to defendant, plaintiff was a public figure for the limited purpose of comment on his connection with, or involvement in, Soviet espionage during the 1940’s and 1950’s.
 

 In applying the
 
 Gertz
 
 test, the court concluded that Wolston did not voluntarily thrust or inject himself into the forefront of the public controversy surrounding the investigation. He was “dragged unwillingly into the controversy.” (443 U.S. at p. 166 [61 L.Ed.2d at p. 460].) His voluntary failure to respond to the subpoena and subsequent citation for contempt resulting in media attention did not transform him into a public figure.
 

 The court also concluded there was no evidence that Wolston’s failure to respond to the subpoena “was intended to have, or did in fact have, any effect on any issue of public concern.” (443 U.S. at p. 168 [61 L.Ed.2d at p. 461].) “In short, we find no basis whatsoever for concluding that [Wolston] relinquished, to any degree, his interest in the protection of his own name.” (Ibid.)
 

 The California Supreme Court addressed the limited purpose public figure question in
 
 Reader’s Digest Assn.
 
 v.
 
 Superior Court, supra,
 
 37 Cal.3d 244. In that case Synanon and its founder, Dederich, sued Reader’s Digest for libel arising out of an article in the magazine. The court found that Synanon was, at the very least, a “limited purpose” public figure for the purposes of the general controversy surrounding its operation, and that Dederich was a public figure to the extent his involvement in directing the activities of Synanon was at issue.
 

 “The cases decided since
 
 New York Times
 
 and
 
 Gertz
 
 make it clear that a person or group should not be considered a ‘public figure’ solely because
 
 *1115
 
 that person or group is a criminal defendant
 
 (Wolston
 
 v.
 
 Reader’s Digest Assn., Inc., supra,
 
 443 U.S. 157); has sought certain relief through the courts
 
 (Time, Inc.
 
 v.
 
 Firestone
 
 (1976) 424 U.S. 448 [47 L.Ed.2d 154, 96 S.Ct. 958]); or merely happens to be involved in a controversy that is newsworthy
 
 (Time, Inc.
 
 v.
 
 Firestone, supra).
 
 Rather, as this court recognized in
 
 Vegod Corp.
 
 v.
 
 American Broadcasting Companies, Inc.
 
 (1979) 25 Cal.3d 763 [160 Cal.Rptr. 97, 603 P.2d 14], a ‘public figure’ plaintiff must have undertaken some
 
 voluntary
 
 act through which he seeks to influence the resolution of the public issues involved. As such, the mere involvement of a person in a matter which the media deems to be of interest to the public does not, in and of itself, require that such a person become a public figure for the purpose of a subsequent libel action.” (37 Cal.3d at p. 254, fn. omitted.)
 

 In
 
 Weingarten
 
 v.
 
 Block
 
 (1980) 102 Cal.App.3d 129 [162 Cal.Rptr. 701], limited purpose public figure status was extended to a former city attorney and counsel for local redevelopment agency. The attorney had initiated a recall of city council members who had voted to discharge him from his position as city attorney. The local newspaper published an unfavorable editorial about him, and he sued for libel.
 

 “The facts as found by the trial court here indicate that Weingarten thrust himself to the forefront of the public controversy that arose around his termination and was actively involved in influencing its resolution by his involvement in the recall and his continuing representation of the Redevelopment Agency as its chief local counsel. By such voluntary and active participation, he relinquished his interest in the protection of his own name. Further here, since Weingarten earned substantial amounts from his public assignments, there was sufficient concern about specific public expenditures to make him a public figure.” (102 Cal.App.3d at p. 142, fns. omitted.)
 

 The same result was reached in
 
 Kaufman
 
 v.
 
 Fidelity Fed. Sav. & Loan Assn.
 
 (1983) 140 Cal.App.3d 913 [189 Cal.Rptr. 818]. In
 
 Kaufman,
 
 plaintiff, chairman of the board of Arrowhead Savings and Loan Association, objected to a zoning change sought by defendant, Fidelity Federal Savings and Loan Association, and participated in numerous public hearings in order to block defendant’s efforts. The political battle between the two received coverage by local media and was a subject of public debate in the small community. Defendant sent a letter to local residents claiming that plaintiff was attempting to influence the board of supervisors in an effort to monopolize savings and loan business in the area. Plaintiff sued for libel based upon the letter.
 

 The court concluded Kaufman was a public figure because he voluntarily injected himself into the zoning dispute and because the letter “directed the
 
 *1116
 
 attention of the recipients of the letter to the matter in controversy and to the role plaintiff played therein as defendant saw it.” (140 Cal.App.3d at p. 921.) The court reasoned Kaufman “must accept the necessary consequences of that involvement in public affairs.”
 
 (Ibid.)
 

 In
 
 Hofmann Co.
 
 v.
 
 E. I. Du Pont De Nemours & Co.
 
 (1988) 202 Cal.App.3d 390 [248 Cal.Rptr. 384], plaintiff, a land developer, sued the owner of a chemical plant located next to property on which plaintiff sought to build a housing project because of comments made by employees of the chemical plant regarding the hazards of the plant that would affect those living adjacent thereto. The court held the developer was a limited purpose public figure and therefore was required to prove actual malice on the part of the employees.
 

 “Though nominally a private-figure plaintiff, for present purposes appellant possesses the attributes of a public figure. It is undisputed that, as described in the Chronicle article, appellant has actively and openly sought to influence public officials and in that manner affect the public decision process for determining the uses to which land in Contra Costa County may be put.” (202 Cal.App.3d at p. 404.)
 

 Applying the principles recited above to the instant case, it is clear that from the summer of 1979 to the beginning of the spring meet in May 1980 there was a substantial and almost continuous public debate and controversy over, first, who would receive the license for the 1980 spring meet and, second, what policies would be followed in conducting the meet. The first issue as to who would receive the license impacted the public’s consciousness dramatically when it was learned the initial contest would be between, on the one side, the plaintiff, a prominent Fresno lawyer and businessman, and on the other side Fresno County Supervisor Harry Huey, a prominent, elected public official. This fact alone whetted the public’s appetite for controversy and created a wide interest in the outcome, apart from the question whether Calfax or FHRA should receive the license on their respective merits.
 

 When the fair directors canceled the initial award of the contract to plaintiff’s organization, plaintiff immediately entered the fray to influence its outcome, i.e., by “thrusting of his personality into the ‘vortex’ of [the] . . . controversy, . . .”
 
 (Curtis Publishing
 
 Co v.
 
 Butts, supra,
 
 388 U.S. at p. 155 [18 L.Ed.2d at p. 1111].) Plaintiff first publicly accused everyone involved of conspiring to take the contract away from Calfax, when the reason for losing the contract was plaintiff’s failure to follow the rules for obtaining the contract. This hyperbole, followed by fair director Lewis’s comment to the media that the dispute had become a “political ball game,” and that the fair
 
 *1117
 
 board had received “a lot of phone calls from a lot of legislators,” only sharpened the public’s interest in the dispute.
 

 Plaintiff’s lawsuit accusing state and local officials of collusion after the contract had been awarded to FHRA was another effort by plaintiff to dominate the dispute as to who should get the contract by exerting pressure on the directors to change their minds and award the contract to Calfax.
 
 [2]
 

 Plaintiff, by his own voluntary and at times bombastic efforts in the latter part of 1979 and the first part of 1980, can be said to have placed himself and Calfax in a situation similar to the land developer in
 
 Hofmann Co.
 
 v.
 
 E. I. Du Pont De Nemours & Co., supra,
 
 202 Cal.App.3d 390, where it was held that a person “who seeks necessary public approval for a . . . project. . . enters the public arena, invites public judgment, and is, for First Amendment purposes, similar to one who seeks government office. He ‘. . . runs the risk of closer public scrutiny than might otherwise be the case.’ ”
 
 (Id.
 
 at pp. 404-405, quoting from
 
 Gertz
 
 v.
 
 Robert Welch, Inc., supra,
 
 418 U.S. at p. 344 [41 L.Ed.2d at p. 808].) Because plaintiff enjoyed “access to the channels of effective communication” regarding his dispute and thus had a “realistic opportunity to counteract false statements”
 
 (Gertz
 
 v.
 
 Robert Welch, Inc., supra,
 
 418 U.S. at p. 344 [41 L.Ed.2d at p. 808]), he became a public figure.
 

 We do not suggest that every applicant for a horse racing license ipso facto becomes a public figure. But when an applicant for such a license becomes deeply embroiled by his own efforts in a public controversy over his application and at every opportunity thrusts himself into the center of the dispute to influence the decision makers as to the merits of the application, as in the present case, the applicant steps from a cloak of privacy into public view for the purpose of his qualifications to be licensed.
 

 Horse racing and gambling are controversial subjects and are deserving of serious public concern. (See
 
 Morrison
 
 v.
 
 California Horse Racing Bd.
 
 (1988) 205 Cal.App.3d 211, 218 [252 Cal.Rptr. 293];
 
 Flores
 
 v.
 
 Los Angeles
 
 
 *1118
 

 Turf Club
 
 (1961) 55 Cal.2d 736, 744-745 [13 Cal.Rptr. 201, 361 P.2d 921];
 
 In re Goddard
 
 (1937) 24 Cal.App.2d 132, 140-141 [74 P.2d 818].) Thus, the California regulatory scheme for licensing and oversight is detailed and replete with rules designed to protect the public from criminal elements who might be attracted to the horse races. (Bus. & Prof. Code, §§ 19480, 19572; Cal. Code Regs., tit. 4, § 1400 et seq.; Pen. Code, § 337a.) It is for these. reasons that an applicant’s personal qualifications to be licensed are subject to public scrutiny and comment in every case.
 

 Plaintiff argues strenuously that even assuming he attained public figure status for the 1980 spring meet, his public status ended after the meet was held and before the publication of the defamatory article. Plaintiff points out correctly that for a period of five and one-half months there was no press comment about either him or Calfax concerning their horse racing activities during the 1980 meet or their qualifications to conduct the coming 1981 spring meet. It was only the publication by the Bee of the allegedly defamatory article of November 14, 1980, that created a new public controversy concerning plaintiff’s qualifications to be relicensed for the 1981 meet. Since a defamation defendant cannot create a defense by creating a controversy from the content of defamatory statements
 
 (Hutchinson
 
 v.
 
 Proxmire
 
 (1979) 443 U.S. 1ll, 135 [61 L.Ed.2d 411, 431, 99 S.Ct. 2675]), and since a plaintiff does not become a public figure simply by responding to defamatory statements
 
 (Time, Inc.
 
 v.
 
 Firestone
 
 (1976) 424 U.S. 448, 454-455, fn. 3 [47 L.Ed.2d 154, 163, 96 S.Ct. 958]), plaintiff contends he was merely a private businessman and lawyer at the time he was allegedly defamed.
 

 While plaintiff’s argument has a superficial appeal, it nonetheless must be rejected. As we have explained, horse racing is a matter of serious public concern because it involves gambling on a large-scale basis. Gambling attracts criminal elements who will engage in illegal wagering, bookmaking and other unlawful acts. For this reason, the personal qualifications, background, and honesty of the license applicant, his organization and his associates are subject to public scrutiny. It is also for this reason that the CURB issues a license for one year only; the regulations require relicensing each year. Thus, when plaintiff announced at the end of the 1980 meet that Calfax would apply for a license to operate the 1981 spring meet, plaintiff’s status as a public figure continued for the limited purpose of his qualifications to obtain a license for that meet. The fact that plaintiff had not formally applied for the 1981 license when defendant’s allegedly defamatory article appeared is of no moment. Public statements issued by plaintiff leading up to and during Calfax’s operation of the 1980 spring horse racing meet, including his announcement that Calfax would seek relicensing for the 1981 season, constituted a purposeful reinjection of plaintiff’s personality
 
 *1119
 
 into the continuing public controversy over the operation of spring horse racing in Fresno. Hence, the issue of plaintiff’s qualifications to be licensed was before the public, and under the First Amendment the Bee was entitled to publish the information it had received regarding plaintiff’s qualifications.
 

 Public figure status, once achieved, does not end spontaneously with the stopping of the publicity. Rather, the public figure status continues as long as the specific issue for which the public status was achieved continues. (Cf.
 
 Street
 
 v.
 
 National Broadcasting Co.
 
 (6th Cir. 1981) 645 F.2d 1227, 1235, holding that once a person becomes a public figure in connection with a particular controversy, the person remains a public figure thereafter for purposes of later commentary on that controversy; see also,
 
 Brewer
 
 v.
 
 Memphis Pub. Co., Inc.
 
 (5th Cir. 1980) 626 F.2d 1238, 1257;
 
 Time, Inc.
 
 v.
 
 Johnston
 
 (4th Cir. 1971) 448 F.2d 378, 380-382.)
 

 Under the totality of the unique circumstances of this case, by publicly announcing his intention to apply for a license for the 1981 spring horse racing meet, plaintiff placed his qualification to be licensed in the public eye and foreclosed his return to private figure status at least until the 1981 licensing procedures were completed.
 

 Disposition
 

 The judgment is affirmed.
 

 Martin, Acting P. J., and Vartabedian, J., concurred.
 

 A petition for a rehearing was denied October 9, 1991, and appellant’s petition for review by the Supreme Court was denied December 12, 1991. Baxter, J., did not participate therein.
 

 *
 

 Retired Presiding Justice of the Court of Appeal, Fifth District, sitting under assignment by the Chairperson of the Judicial Council.
 

 [1]
 

 All defendants will be referred to herein collectively as “defendant” or “the Bee.”
 

 [2]
 

 Another controversy permeated plaintiff’s efforts to conduct the 1980 spring meet from the outset—whether racing should be held on Sundays. This question naturally evokes strong feelings on the part of certain religious groups and individuals opposed to gambling on their Sabbath. Plaintiff met the problem by first announcing that he did not want to offend the community and that he had spoken with several religious leaders about the subject. Plaintiff then used every media opportunity to convince the public that most people favored Sunday racing; that Sunday racing would be more popular than Saturday racing; and that he would start the Sunday races at 1 p.m. rather than 12 noon so as not to interfere with church attendance. While these efforts may have been commendable in their directness, they could not have lessened to any substantial degree the deeply felt concern of a segment of the Fresno community opposed to Sunday gambling.