Filed 1/31/24  Arax v. Thomas CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DON ARA ARAX,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KESHIA THOMAS et al.,<br><br>    Defendants and Appellants. | F085518<br><br>(Super. Ct. No. 22CECG02449)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Kristi Culver Kapetan, Judge.

Bruce J. Berger Law Firm, Bruce J. Berger and Joshua D. Milton for Defendant and Appellant Keshia Thomas.

Whitney, Thompson & Jeffcoach, Mandy L. Jeffcoach, Kristi D. Marshall and Paul R. Gaus for Defendant and Appellant Fresno Unified School District.

Whelan Law Group, Brian D. Whelan and Joseph A. Stolz for Plaintiff and Respondent.

-ooOoo-

Don Ara Arax coached high school football in the Fresno Unified School District (FUSD).  Keshia Thomas was/is an elected member of the FUSD Board of Trustees.

During a media appearance, Thomas accused Arax of using a particular racial slur ("the N-word") while speaking to her son during football practice. Arax denied the accusation and sued Thomas for defamation. FUSD was named as a defendant based on a theory of respondeat superior.

Thomas and FUSD filed special motions to strike the complaint pursuant to Code of Civil Procedure section 425.16, also known as the anti-SLAPP statute. "SLAPP" is an acronym for Strategic Lawsuit Against Public Participation. (*Oasis West Realty*, *LLC v. Goldman* (2011) 51 Cal.4th 811, 815, fn. 1.) Thomas and FUSD now appeal from orders denying their respective motions. We conclude the motions were appropriately denied.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2022, Arax filed a civil complaint alleging a cause of action for defamation against Thomas and FUSD. In October 2022, Thomas and FUSD filed separate anti-SLAPP motions. The motions were heard on November 17, 2022. The trial court later issued written orders partially granting and partially denying both motions. Thomas and FUSD each filed timely notices of appeal.

*Arax's Allegations and Supporting Evidence*

According to sworn declarations, Arax has been a teacher at Bullard High School since approximately April 2000 and, "[i]n that time period, … also served as [Bullard's] Varsity Football Head Coach." Thomas, who was elected to the FUSD Board of Trustees in 2018, represents a geographic region within FUSD that includes Edison High School. Thomas does not represent the region in which Bullard High School is located.

Thomas's "youngest son" attended Bullard High School from at least 2021 to 2022. However, Thomas's youngest son is *not* the person to whom she referred in the allegedly defamatory statements about Arax. The statements concerned her "middle son."

Arax's complaint and declarations allege Thomas developed "animosity" toward him during the summer of 2021, and her animosity was later "reignited and fueled" by an

2.

incident involving her "youngest son" in December 2021. Those allegations concern the issue of malice and are detailed elsewhere in the opinion.

Thomas's allegedly defamatory statements were preceded and ostensibly precipitated by an incident at Bullard High School on May 4, 2022. The complaint alleges a student was photographed wearing "what appeared to be a Ku Klux Klan hood. … Ultimately, another student posted the picture to social media[,] causing an uproar, public outcry, and rush to judgment."

Two days later, on May 6, 2022, Thomas attended a morning staff meeting at Bullard High School. Arax contends Thomas's presence at the meeting was "highly irregular." He further contends that during the meeting, Thomas "accused 'white' Bullard High School coaches of using the 'N-word' on campus." Thomas did not identify anyone by name. However, in light of subsequent events, Arax claims Thomas was making an implied accusation against him.

On May 9, 2022, Thomas attended a press conference with the FUSD superintendent and two other FUSD trustees. During her appearance, Arax alleges Thomas publicly "claimed FUSD had historically covered up and ignored past instances of racist behavior at Bullard High School and called for the creation of a special commission to investigate and recommend appropriate remediation measures." Thomas also allegedly "stated that Bullard High School, and specifically certain members of its staff were racist against African American students." Although Thomas did not identify any staff by name, Arax contends this was another implied accusation against him.

On May 17, 2022, Thomas appeared as a guest on "Unfiltered," which is described in the record as a "public affairs program hosted by GV Wire publisher Darius Assemi [that is] live-streamed on Facebook." Arax's evidence includes promotional material showing the program is also known as "The Darius, Steve & Mike Show," referring to Assemi and cohosts Steve Brandau (a member of the Fresno County Board of Supervisors) and Mike Karbassi (a member of the Fresno City Council). The

promotional material described the evening's topic as "Bullard High and Racism in Fresno Unified." It further advertised "Special Guests," with a photograph of Thomas above her name and the title of "Fresno Unified Trustee." Two additional "Special Guests" (the "Bullard High School PTA President" and a "Mother of [a] Bullard High School Student") were depicted in the same manner.

The following exchange took place between Thomas and host Darius Assemi during Thomas's appearance on the "Unfiltered" program:

| | |
|---|---|
| Thomas: | "'Then my son, my middle son, goes to football practice, where he has Arax calling him [the N-word] and he decides he's not playing for Bullard anymore. Ok. And he ends up playing at Edison. |
| Assemi: | "'Could you tell our audience … you said Arax. Who is Arax? |
| Thomas: | "'Yeah. He's the football coach at Bullard. You know … so my son, when he was starting high school, my 23 year old, when he was starting high school he said "mom I am not going to play football for them because the coach is saying this to me, and I am not going …" and this is before I became a trustee.'" |

On the night of the "Unfiltered" broadcast, Arax was contacted by a GV Wire reporter for a response to Thomas's accusation. Arax claims to have told the reporter it was "ridiculous and false." Three days later, on May 20, 2022, GV Wire published a written article by the same reporter under the headline, "*Bullard Coach Calls Trustee a 'Liar' on Racial Slur Accusation, Says 'Investigate Me.'*"

In the GV Wire article of May 20, 2022, Thomas's allegedly defamatory statements were construed to mean her middle son had once been "a Bullard student and football player." It is unclear from the record whether, or to what extent, this was based on the reporter's own interpretation of Thomas's story. However, the article claimed Thomas had made additional statements to the reporter regarding Arax's denial of the accusation: "'First and foremost I have no reason to lie,' [Thomas] said in a text Friday

4.

afternoon to GV Wire. 'I'm sure my son and his friends who were on the team would be willing to make a statement seeing as they are graduates and he [i.e., Arax] is no longer a threat to their education.'"

Thomas was also quoted in the GV Wire article as saying Arax "is 'completely unfit to be in this discussion [about racism] … [and should] (refrain) from referring to [students] in a demeaning manner."

Arax's complaint alleges Thomas's story is provably false because her middle son never attended Bullard High School. Therefore, he was never a member of Bullard's football team. Arax has further denied ever calling any student the N-word, and he maintains Thomas's story "was a fabrication and a lie."

Thomas, in support of her anti-SLAPP motion, filed a declaration in which she attempted to explain the statements at issue:

> "In or around Summer 2013, Mr. Arax invited my middle son … to participate in a summer football camp. At the time [my middle son] was a student at Tenaya Middle School within FUSD and Mr. Arax was the head football coach at Bullard High School. Mr. Arax waived fees to participate in the camp and, even though [my middle son] would have likely gone to Bullard High School based on his attendance at Tenaya Middle School, I believe Mr. Arax invited [him] to the summer camp to recruit him to play football for Bullard High School.

> "A few days after the start of the summer camp, [my middle son] told me Mr. Arax used the [N-word] during football practice in reference to Black players, including [him], and that he would not play football for Mr. Arax or Bullard High School because of Mr. Arax's use of that slur. I believed my son when he told me Mr. Arax used that slur, and I still believe him to this day."

In a sworn declaration responsive to Thomas's motion, Arax said he had searched for and had not located any records verifying the statements regarding her son's camp attendance or the waiver of fees. Arax further declared that he did not coach the "2013 Summer Camp." The camp was run by the head coach of Bullard High School's freshman and junior varsity football teams, and by two African American assistant

5.

coaches. Those three coaches provided supporting declarations attesting to their involvement in the camp, and all denied having knowledge of any coach using a racial slur toward any camp participants. The declarants further attested to having never heard Arax use the N-word.

Regarding the liability of FUSD, the complaint alleges Thomas "was acting as an agent of FUSD and within the course and scope of her agency as a FUSD agent and elected trustee when she defamed [Arax]." The complaint further alleges FUSD and Thomas "conspired to, and in fact, did negligently, recklessly, and intentionally cause excessive and unsolicited internal and external publications of defamation, of and concerning [Arax], to third persons and to the community." FUSD is also said to have "authorized, ratified and approved" Thomas's actions.

### Thomas's Arguments and Evidence

Thomas's moving papers argued, in pertinent part, that she has a complete defense under Civil Code section 47, subdivision (a). Sometimes called the official duty privilege, the provision applies to any "publication or broadcast" made "[i]n the proper discharge of an official duty." (*Ibid.*) The meaning of this language and the factual prerequisites for such immunity are the focus of our legal analysis herein.

In a supporting declaration, Thomas attested to her status as an FUSD trustee whose responsibilities include "policymaking and oversight of FUSD implementation of such policies." Thomas alleged and declared she "was acting in her capacity as an elected FUSD [t]rustee at all relevant times alleged in the [c]omplaint." She also claimed her allegedly defamatory statements were made while "speaking to a matter of public concern."

Thomas also argued Arax is a "limited public figure" and must therefore establish the element of malice. She attested to believing in the truth of her accusations against Arax, and further argued her sworn declaration of such belief defeated Arax's defamation claim as a matter of law.

6.

Thomas filed additional evidence with her reply brief, but the trial court declined to consider it due to untimeliness. We discuss the excluded evidence in other parts of the opinion.

*FUSD's Arguments and Evidence*

FUSD's motion relied, in pertinent part, on Government Code section 815.2. Under that statute, a public entity may be vicariously liable for the tortious conduct of an employee only if such conduct occurred "within the scope of [the tortfeasor's] employment." (*Id*., subd. (a).) The moving papers argued Thomas had acted "outside the scope of her employment" and in a "parental capacity" rather than her official capacity as an FUSD trustee. FUSD did not, however, proffer any evidence in support of those contentions.

As an alternative position, FUSD argued Arax is a "limited public figure" and must therefore show Thomas acted with malice. To support the first part of this argument, FUSD proffered three news articles published between 2013 and 2021 in which Arax had been quoted on topics concerning FUSD football programs. For the second part of the argument, FUSD basically repeated Thomas's contention regarding the alleged sufficiency of her declaration to prove the absence of malice.

*The Trial Court's Rulings*

Thomas and FUSD initially believed Arax was asserting multiple defamation claims within a single cause of action. When the motions were heard, his attorney clarified the cause of action was based on (1) Thomas's accusation during the "Unfiltered" program on May 17, 2022; (2) the republication of that accusation on May 20, 2022, in the GV Wire written article; and (3) Thomas's additional statements in the GV Wire article about Arax being "unfit." The trial court determined the "unfit" statements were nonactionable expressions of opinion. Both motions were therefore granted in part, i.e., only as to those nonactionable portions of the GV Wire article. (See

7.

*Baral v. Schnitt* (2016) 1 Cal.5th 376, 393 ["an anti-SLAPP motion, like a conventional motion to strike, may be used to attack parts of a count as pleaded"].)

Arax was held to have otherwise established a prima facie defamation claim against both defendants. Thus, as to the cause of action itself and the overall complaint, the motions were denied. The trial court ruled there were questions of fact regarding the capacity in which Thomas had acted and whether her statements were privileged under Civil Code section 47, subdivision (a). The court partially relied on *Lipman v. Brisbane Elementary Sch. Dist.* (1961) 55 Cal.2d 224, which did not involve that statutory privilege but is analogous in other respects (see further discussion, *post*). The trial court also ruled there were questions of fact about Thomas's "motivation for making the statements" and whether she had acted "outside the course and scope of the role of trustee."

The trial court "decline[d] to designate [Arax] as a limited public figure based on the evidence and arguments submitted." The court said the evidence, including the news articles proffered by FUSD, "does not demonstrate that [Arax] has injected himself or his views into public controversy … in connection with the conversation about racism at Bullard High School and within the school district." Because Arax was not shown to be a public figure, the trial court did not reach the issue of malice.

## REQUESTS FOR JUDICIAL NOTICE

Arax, Thomas, and FUSD have all filed motions to have judicial notice taken of various material. Some of the requests concern new evidence. For the following reasons, each motion is hereby denied.

### *Applicable Law*

"It is well recognized that the purpose of judicial notice is to expedite the production and introduction of otherwise admissible evidence." (*Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 578.) The Evidence Code requires reviewing courts to take judicial notice of certain material (*id.*, § 459, subd. (a)) and permits judicial notice

8.

of certain other material (*id*., § 452). However, "[a]n appellate court may properly decline to take judicial notice under Evidence Code sections 452 and 459 of a matter which should have been presented to the trial court for its consideration in the first instance." (*Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325–326.) "[A]s a general rule the court should *not* take such notice if, upon examination of the entire record, it appears that the matter has not been presented to and considered by the trial court in the first instance." (*People v. Preslie* (1977) 70 Cal.App.3d 486, 493, italics added; accord, *Vons Companies*, *Inc. v. Seabest Foods*, *Inc*. (1996) 14 Cal.4th 434, 444, fn. 3.)

Appellate courts review the correctness of a ruling "'as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.'" (*In re Zeth S*. (2003) 31 Cal.4th 396, 405.) Therefore, "[d]ocuments not presented in the trial proceeding generally cannot be included as part of the record on appeal and must be disregarded on appeal as beyond the scope of review." (*Glassman v. Safeco Ins. Co. of America* (2023) 90 Cal.App.5th 1281, 1307.) This is especially true where the evidence was previously available to the parties. (See *In re Utz* (1989) 48 Cal.3d 468, 481.) "The court's power to accept new evidence on appeal should not be exercised when the appellant has failed to show good cause for the unavailability of the evidence in the trial court." (*Tsakos Shipping & Trading*, *S.A. v. Juniper Garden Town Homes*, *Ltd*. (1993) 12 Cal.App.4th 74, 87.) "Further, even if a reviewing court takes judicial notice of documents, it is not for the truth of matters asserted therein." (*Glassman*, at p. 1307.)

***Arax's Motions***

Arax requests judicial notice of the opening briefs filed by Thomas and FUSD in the present appeal. Judicial notice of those briefs is unnecessary, as they are already properly before this court. (See, e.g., *Central Delta Water Agency v. Department of Water Resources* (2021) 69 Cal.App.5th 170, 189, fn. 4.) Arax's motions are therefore denied.

*Thomas's Motion*

Thomas claims the trial court made a prejudicial error by rejecting various evidence submitted with her reply brief. She asks us to take judicial notice of the evidence, which consists of official minutes from FUSD board meetings held in October 2021 and May 2022, and two GV Wire news articles published in June 2022. Judicial notice of these items is unnecessary since they were filed with the trial court and are already part of the record on appeal. (E.g., *Davis v. Southern California Edison Co.* (2015) 236 Cal.App.4th 619, 632, fn. 11 [denying as unnecessary a request for judicial notice of documents "that were before the trial court and … included in the joint appendix"].)

Thomas also requests judicial notice of material she concedes was never presented to the trial court. The new evidence, introduced for the first time on appeal, is a GV Wire news article dated May 6, 2022, i.e., two days after the so-called "KKK photo" incident at Bullard High School. The article claims Arax gave a statement to a GV Wire reporter in which he allegedly "defended the student in the controversial picture [by] saying there were no intended racial overtones to the image." Arax is quoted in the article as saying, "'He was doing a ninja dance, whatever that is.'"[1]

Thomas is not merely asking for judicial notice of the topic and publication date of the news article. She is relying on the truth of matters asserted therein, namely the contention Arax made statements to the press regarding the photograph controversy. Thomas argues this shows Arax "injected himself into [a] controversy" related to her allegedly defamatory statements and thus became a "limited public figure" for purposes of the lawsuit. Thomas also claims the evidence "definitively negates the trial court's

---

[1]The article includes the photograph in question and explains the student was not actually wearing a "KKK hood." The image depicts a person with a whitish, semitransparent garment (similar to a stocking) pulled over the head and face. The picture was taken as someone behind the individual was holding a slackened portion of the garment upward, thereby causing it to have a triangular shape.

10.

determination that Arax did not inject himself into the public controversy prior to Thomas' allegedly defamatory statements."

We have already discussed the rule against judicially noticing a document for the truth of its contents. "The truth of the content of [newspaper] articles is not a proper matter for judicial notice." (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1141, fn. 6; accord, *Voris v. Lampert* (2019) 7 Cal.5th 1141, 1147, fn. 5.) Furthermore, "'[r]eviewing courts generally do not take judicial notice of evidence not presented to the trial court' absent exceptional circumstances." (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2.) Thomas makes no effort to explain why she did not proffer the evidence in the proceedings below, nor does she allege exceptional circumstances. Her motion is therefore denied.

Although Thomas claims the evidence conclusively establishes her position on the public figure dispute (a contention we decline to address), she suffers no legal detriment from our ruling. Whether a defamation plaintiff is a public or private figure "is in the first instance a question of law for the trial court to decide." (*Mosesian v. McClatchy Newspapers* (1991) 233 Cal.App.3d 1685, 1694.) Here, the trial court merely "decline[d] to designate [Arax] as a limited public figure *based on the evidence and arguments submitted with [Thomas's] motion.*" (Italics added.) Because the parties' anti-SLAPP evidence did not include the GV Wire article of May 6, 2022, neither the trial court's ruling nor the disposition on appeal prevents Thomas from relying on the article in later stages of the case. The denial of an anti-SLAPP motion does not preclude, for example, a summary adjudication motion based upon "additional or different evidence that would, as a matter of law, conclusively negate plaintiff's prima facie case." (*Bergman v. Drum* (2005) 129 Cal.App.4th 11, 18, italics omitted; see Code Civ. Proc., § 425.16, subd. (b)(3).)

Even if Thomas could have established Arax's status as a public figure, her motion would have been denied absent a showing of Arax's inability to prove malice. As we

11.

will discuss, the evidence before the trial court did not show the absence of malice as a matter of law.

***FUSD's Motion***

FUSD requests judicial notice of three of its Board of Trustees' bylaws, which FUSD labels as "Bylaw 9000," "Bylaw 9005," and "Bylaw 9010."

### Bylaw 9000

Bylaw 9000 says the FUSD Board of Trustees is "elected by the community to provide leadership and citizen oversight of the district's schools." The bylaw further reflects various policymaking functions of the board and its members. In the proceedings below, defendant Thomas made an unopposed request for judicial notice of Bylaw 9000. "Because the record contains no indication the request was denied, we presume that it was granted." (*Casey v. Hill* (2022) 79 Cal.App.5th 937, 975, fn. 16; accord, *Aaronoff v. Martinez-Senftner* (2006) 136 Cal.App.4th 910, 918–919, citing Evid. Code, §§ 453, 456.) Given those circumstances, and because it is already part of the appellate record, judicial notice of Bylaw 9000 is unnecessary. (See, e.g., *Physicians Committee for Responsible Medicine v. Los Angeles Unified School Dist.* (2019) 43 Cal.App.5th 175, 182, fn. 2; *Davis v. Southern California Edison Co.*, *supra*, 236 Cal.App.4th at p. 632, fn. 11.)

We note FUSD is requesting judicial notice of the *current* version of Bylaw 9000, which was revised in May 2023. The bylaws are relevant to the litigation only as they existed at the time of the subject events, i.e., in May 2022. FUSD's request is denied for this reason as well. (See *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 295, fn. 21 [refusing to take judicial notice of irrelevant matter]; *Ross v. Seyfarth Shaw LLP* (2023) 96 Cal.App.5th 722, 745–746 [same].)

**Bylaw 9005**

Bylaw 9005 lists multiple sets of enumerated "Governance Standards" for FUSD's Board of Trustees. In the proceedings below, Arax requested judicial notice of this bylaw and the trial court expressly granted his request. Because the trial court judicially noticed Bylaw 9005 as it existed in May 2022, and a copy of that version is part of the record on appeal, judicial notice is unnecessary. (See *Physicians Committee for Responsible Medicine v. Los Angeles Unified School Dist.*, *supra*, 43 Cal.App.5th at p. 182, fn. 2; *Davis v. Southern California Edison Co.*, *supra*, 236 Cal.App.4th at p. 632, fn. 11.)

FUSD is requesting judicial notice of the *current* version of Bylaw 9005, which was revised in March 2023. Again, the relevant version is the one in effect as of May 2022. The request is therefore denied. (See *Ross v. Seyfarth Shaw LLP*, *supra*, 96 Cal.App.5th at pp. 745–746.)

**Bylaw 9010**

Bylaw 9010 (last revised in 2016) sets forth rules and guidelines for public statements by FUSD board members. For example, "Board members are expected to respect the authority of the Board to choose its representatives to communicate its positions and to abide by established protocols. [¶] All public statements authorized to be made on behalf of the Governing Board shall be made by the Board president or, if appropriate, by the Superintendent or designee at the direction of the Board president. No individual Board member shall make public statements in the name of the Board."

FUSD seeks judicial notice of Bylaw 9010 to support the argument Thomas was not acting in the course and scope of her employment when she made the allegedly defamatory statements. FUSD concedes this evidence was never presented to the trial court. We note FUSD did not rely upon *any* bylaws in its moving papers. It was not until the motion hearing, after the trial court had tentatively ruled to deny its motion, that FUSD attempted to rely on parts of Bylaw *9005* (which Arax had cursorily mentioned in his opposition to *Thomas's* motion). The trial court considered FUSD's belated argument

13.

and rejected it, concluding that "[w]ithout additional context and evidence[,] it is unclear how [Bylaw 9005] may relate to the media appearance where the statements were made."

To summarize, Bylaw 9010 was not presented to the trial court. It was not even mentioned until FUSD's briefing on appeal. FUSD offers no explanation for why the evidence was not discussed or proffered below, nor does FUSD allege exceptional circumstances. Consistent with the rules disfavoring new evidence on appeal, "[a]ppellate courts are loath to reverse a [ruling] on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider." (*JRS Products*, *Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178.)

FUSD makes a "judicial economy" argument, which we do not find persuasive. As we discuss *post*, violations of an employer's policies and rules is not necessarily dispositive of the "course and scope" issue. There are also questions of fact regarding allegations in the complaint that FUSD "authorized, ratified and approved" Thomas's actions. Our judicial notice ruling does not preclude FUSD from relying on Bylaw 9010 to support a motion for summary judgment (see *Bergman v. Drum*, *supra*, 129 Cal.App.4th at p. 18), but the anti-SLAPP evidence does not conclusively show FUSD can defeat Arax's claim as a matter of law.

## DISCUSSION

### I. Defamation Law

"Defamation is an invasion of the interest in reputation. The tort involves the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage. [Citations.] Publication means communication to some third person who understands the defamatory meaning of the statement and its application to the person to whom reference is made." (*Smith v.*

14.

*Maldonado* (1999) 72 Cal.App.4th 637, 645, fn. omitted.) Dissemination to "the 'public' at large" is actionable but not required. (*Ibid.*)

Defamation occurs in the form of libel or slander. (Civ. Code, § 44.) "Libel is a false and unprivileged publication by writing, … or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (*Id.*, § 45.) Slander is oral defamation. (*Id.*, § 46.) The elements of falsity, lack of privilege, publication, and reputational harm are common to both forms. "The original slanderer may be liable for the repetition of the slander by a third person, if the slanderer had reason to expect such repetition." (*Ringler Associates Inc. v. Maryland Casualty Co*. (2000) 80 Cal.App.4th 1165, 1180.)

In general, defamation plaintiffs are not required to prove the elements of falsity and lack of privilege, or to show the defendant acted with malice. (*ZL Technologies*, *Inc. v. Does 1-7* (2017) 13 Cal.App.5th 603, 631; see *Beroiz v. Wahl* (2000) 84 Cal.App.4th 485, 492 ["Privilege is an affirmative defense to a claim of defamation"].) It is ordinarily the defendant's burden "to 'justify' or show the truth of the statements" in question. (*Ringler Associates Inc. v. Maryland Casualty Co*., *supra*, 80 Cal.App.4th at p. 1180.) "However, where the communication involves a matter of public concern, the plaintiff does bear the burden of pleading and proving falsity." (*Industrial Waste & Debris Box Service*, *Inc. v. Murphy* (2016) 4 Cal.App.5th 1135, 1156.)

If the alleged defamation involves a matter of public concern and the plaintiff is seeking presumed damages or punitive damages, the plaintiff must prove falsity and malice. (*Brown v. Kelly Broadcasting Co*. (1989) 48 Cal.3d 711, 747.) "In this context, actual malice means that the defamatory statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" (*Khawar v. Globe Internat.*, *Inc.* (1998) 19 Cal.4th 254, 275, quoting *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 280.) If the plaintiff is deemed to be a "public figure," malice becomes an

essential element of the defamation claim. (*Vegod Corp. v. American Broadcasting Companies*, *Inc*. (1979) 25 Cal.3d 763, 766; *Franklin v. Benevolent etc. Order of Elks* (1979) 97 Cal.App.3d 915, 922.)

There are two types of public figures. "The first is the 'all purpose' public figure who has 'achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.' The second category is that of the 'limited purpose' or 'vortex' public figure, an individual who 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.'" (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 253.) A limited purpose public figure "loses certain protection for his reputation only to the extent that the allegedly defamatory communication relates to his role in a public controversy." (*Id*. at p. 254.)

## II.     The Anti-SLAPP Framework

The anti-SLAPP statute is designed to deter and quickly dispose of frivolous litigation arising from the exercise of a constitutional right of petition or free speech. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 311–312.) A defendant may respond to such litigation by filing a special motion to strike pursuant to Code of Civil Procedure section 425.16, subdivision (b), within 60 days of service of the complaint. (*Id*., subd. (f).) This allows the trial court to evaluate the lawsuit at an early stage in a manner akin to summary judgment. (*Varian Medical Systems*, *Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.)

"Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from [protected free speech or petitioning activity]." (*Baral v. Schnitt*, *supra*, 1 Cal.5th at p. 384.) "If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim

16.

by establishing a probability of success." (*Ibid*.)  "But the plaintiff's second-step burden is a limited one."  (*Wilson v. Cable News Network, Inc*. (2019) 7 Cal.5th 871, 891.)

"Only a '"minimum level of legal sufficiency and triability"' is needed to satisfy the second prong of the anti-SLAPP statute."  (*Castleman v. Sagaser* (2013) 216 Cal.App.4th 481, 490.)  The trial court "does not weigh evidence or resolve conflicting factual claims.  Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.  It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law.  [Citation.]  '[C]laims with the requisite minimal merit may proceed.'"  (*Baral v. Schnitt, supra*, 1 Cal.5th at pp. 384–385.)

"When evaluating an affirmative defense in connection with the second prong of the analysis of an anti-SLAPP motion, the court, following the summary-judgment-like rubric, generally should consider whether the defendant's evidence in support of an affirmative defense is sufficient, and if so, whether the plaintiff has introduced contrary evidence, which, if accepted, would negate the defense."  (*Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 434; see *Laker v. Board of Trustees of California State University* (2019) 32 Cal.App.5th 745, 769 ["defendants bear the burden of proof on any affirmative defense"].)  "If the defendant's evidence does *not* demonstrate that plaintiff cannot prevail as a matter of law," the only remaining question is "whether evidence favoring the plaintiff, standing alone, would sustain a judgment in his or her favor."  (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 84, italics added.)

The parties dispute where the burden lies on the issue of whether Thomas's statements are privileged.  While the absence of privilege is an element of libel and slander, it has long been held that privilege is nevertheless an affirmative defense to both forms of defamation.  (*Locke v. Mitchell* (1936) 7 Cal.2d 599, 602; *Beroiz v. Wahl, supra*,

17.

84 Cal.App.4th at p. 492.)  Although the anti-SLAPP statute "places on the plaintiff the burden of substantiating its claims, a defendant that advances an affirmative defense to such claims properly bears the burden of proof on the defense."  (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 676.)  Thus, "[d]uring the second prong of a court's anti-SLAPP analysis, a defendant bears the burden of proving a privilege's applicability."  (*Neurelis, Inc. v. Aquestive Therapeutics, Inc.* (2021) 71 Cal.App.5th 769, 794.)

"What is important is that, regardless of the burden of proof, the court must determine whether plaintiff can establish a prima facie case of prevailing, or whether defendant has defeated plaintiff's evidence as a matter of law."  (*Dickinson v. Cosby* (2017) 17 Cal.App.5th 655, 683.)  If the evidence before the court does not establish the applicability of a privilege as a matter of law, an anti-SLAPP movant cannot prevail on the argument that a defamatory statement was privileged.

## III.    Standard of Review

The denial of an anti-SLAPP motion is immediately appealable.  (Code Civ. Proc., §§ 425.16, subd. (i), 904.1, subd. (a)(13).)  The standard of review is de novo.  (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067.)  We engage "in the same two-step process as the trial court to determine if the parties have satisfied their respective burdens."  (*Castleman v. Sagaser*, *supra*, 216 Cal.App.4th at p. 490.)  All evidentiary conflicts and competing inferences are resolved in favor of the plaintiff, i.e., Arax.  (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 795.)

## IV.    Civil Code Section 47, Subdivision (a)

The main issue on appeal concerns Civil Code section 47, subdivision (a) (henceforth "section 47(a)").  If Thomas's statements are privileged, her affirmative defense inures to the benefit of FUSD and both are entitled to judgment as a matter of law.  (See Gov. Code, § 815.2, subd. (b).)  Arax and Thomas generally agree on the

requirements of section 47(a). However, because of certain arguments by FUSD, we provide a more thorough discussion of the law than would otherwise be necessary.

In 1872, when Civil Code section 47 was enacted, "defamation was subject to strict liability, that is, liability without fault as to truth or falsity." (*Brown v. Kelly Broadcasting Co.*, *supra*, 48 Cal.3d at p. 726.) "To ameliorate the harshness of the strict-liability standard, certain privileges and defenses developed in the common law." (*Id.* at p. 727.) There are two types of privileges for communications: "'An "absolute" privilege excludes liability for a publication notwithstanding that it is made with actual malice, whereas a "qualified" or "conditional" privilege does not protect a defendant who has acted maliciously.'" (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 718.)

Apart from being renumbered in 1991 (Stats. 1990, ch. 1491, § 1), the text of section 47(a) has been the same for over 150 years: "A privileged publication or broadcast is one made: [¶] (a) In the proper discharge of an official duty." The California Supreme Court first interpreted this language in *Saroyan v. Burkett* (1962) 57 Cal.2d 706 (*Saroyan*). The *Saroyan* defendant was a state official (the Superintendent of Banks) who had been sued for defamation. (*Id.* at p. 707.) The defamatory statements were made while the defendant "was acting in the exercise of an executive function" and defending "the policy of his department." (*Id.* at p. 710.) "[H]is statements were related to the defense of that policy." (*Id.* at pp. 710–711.)

The issue in *Saroyan* was "whether officials in discharging their duties have an absolute privilege [and], if so, to what extent." (*Saroyan*, *supra*, 57 Cal.2d at pp. 708–709.) The California Supreme Court determined the section 47(a) privilege is absolute, then addressed the question of "which executive officials have an absolute privilege" with respect to defamation. (*Id.* at p. 710.) The court ultimately adopted "the rule granting an absolute privilege to state officials corresponding in rank to federal cabinet members" as set forth in section 591 of the Restatement of Torts. (*Saroyan*, at p. 710.)

19.

Such officials are "'absolutely privileged to publish false and defamatory matter of another in the exercise of an executive function, if the matter has some relation to the executive proceeding in which the officer is acting.'" (*Ibid*., quoting Rest., Torts, § 591.)

By the mid-1970's, it was considered settled "that the absolute privilege under [section 47(a)] is extended only to high ranking federal and state officials such as the President of the United States, governors of the states and territories, the members of the President's cabinet, heads of federal agencies, and comparable state officers." (*Frisk v. Merrihew* (1974) 42 Cal.App.3d 319, 323.) In *Frisk*, the appellate court summarily rejected the privilege arguments of a school district's superintendent and secretary. (*Id*. at pp. 322–323.) The opinion holds, "A school superintendent or secretary of a school board is clearly outside the above-defined cabinet level state officials." (*Id.* at p. 323.)

The California Supreme Court revisited the issue in *Sanborn v. Chronicle Publishing Co*. (1976) 18 Cal.3d 406 (*Sanborn*). The opinion acknowledged "that the courts of this state have thus far extended the protections of [section 47(a)] only to high-ranking state and federal officials." (*Id*. at p. 412.) The court also said, "It has been noted by recognized authorities that the purpose of the so-called absolute 'official duty' privilege is to insure efficiency in government by encouraging *policy-making* officials to exercise their best judgment in the performance of their duties free from fear of general tort liability." (*Id*. at p. 413.)

In *Sanborn*, the Clerk of the City and County of San Francisco (the clerk) had defamed the plaintiff while acting "within the scope of his authority," i.e., while "issu[ing] statements to the press and [giving] interviews regarding the operation of the clerk's office." (*Sanborn*, *supra*, 18 Cal.3d at p. 412.) The clerk argued his statements were privileged under section 47(a), but the high court refrained from expressly deciding whether the privilege is available to lower ranking officials. The court held that because the clerk "was not exercising policy-making functions when he defamed plaintiff," he was "not protected" by section 47(a). (*Sanborn*, at p. 413.)

20.

The *Sanborn* court analyzed the section 47(a) claim together with a claim of immunity under Government Code section 820.2, doing so in a manner indicating the analysis for both was the same. (See *Sanborn*, *supra*, 18 Cal.3d at pp. 413 [stating the reason for denying privilege claim is "discuss[ed] below in greater detail"], 414–415 [discussing Gov. Code, § 820.2].) The latter statute immunizes public employees for discretionary decisions "whether or not such discretion be abused." (Gov. Code, § 820.2.) But the immunity applies only "with respect to 'basic policy decisions,' or activity which may be characterized as the 'planning' rather than the 'operational' level of decision making." (*Sanborn*, at p. 415.) Therefore, the party claiming discretionary immunity must show "'that such a policy decision, consciously balancing risks and advantages, took place.'" (*Ibid.*)

While it was "arguable that [the clerk] may have had discretion to discuss [matters concerning the plaintiff] with the press," the *Sanborn* court held the decision to grant a media interview was not "in the nature of a 'basic policy decision' made at the 'planning' stage of City's operations." (*Sanborn*, *supra*, 18 Cal.3d at p. 415.) "*A governmental officer's discussions with the public or press regarding the functioning of his office would seem, instead, to fall within the category of those routine, ministerial duties incident to the normal operations of that office.*" (*Ibid.*, italics added.)

In *Royer v. Steinberg* (1979) 90 Cal.App.3d 490 (*Royer*), the First Appellate District, Division Four, interpreted *Sanborn* as tacitly holding the section 47(a) privilege is available "to all state and local officials who engage in the policy-making process." (*Royer*, at p. 501.) But for lower ranking officials, it is limited to statements made "(a) while exercising policy-making functions, and (b) within the scope of [their] official duties." (*Ibid.*) Subsequent appellate decisions have agreed with *Royer*. (E.g., *Neary v. Regents of University of California* (1986) 185 Cal.App.3d 1136, 1141–1142 (*Neary*); *H & M Associates v. City of El Centro* (1980) 109 Cal.App.3d 399, 408.) In *Neary*, for example, the appellate court cited *Sanborn* and *Royer* in noting, "The official duty

21.

privilege has been extended to lower level state or local officials so long as the publication was made while the official was exercising his policymaking function and was acting within the scope of his official duties." (*Neary*, at p. 1141.)

The *Neary* opinion correctly observes that in *Sanborn*, "the California Supreme Court discussed when an official is engaged in exercising his policymaking functions by reference to cases construing immunity for discretionary acts under Government Code section 820.2." (*Neary*, *supra*, 185 Cal.App.3d at p. 1142.) Accordingly, *Neary* holds that to be engaged in a policymaking function for purposes of section 47(a), "the official must reach a basic policy decision, as distinct from an operational decision, after balancing risks and advantages." (*Neary*, at p. 1142, citing *Sanborn*, *supra*, 18 Cal.3d at p. 415.) Pursuant to this holding, the *Neary* court reversed a summary judgment ruling due to triable issues regarding whether the defendant's allegedly defamatory actions occurred in the exercise of a policymaking function. (*Neary*, at p. 1143.)

Although FUSD does not criticize *Royer* in its opening brief and even purports to rely upon it, FUSD's reply brief challenges the holdings of *Royer* and *Neary*. In the reply, FUSD contends *Neary* (and by necessary implication *Royer* as well) "appears out of line" with other appellate decisions. FUSD specifically relies on *Copp v. Paxton* (1996) 45 Cal.App.4th 829 (*Copp*).

In *Copp*, the First Appellate District, Division One, proposed and endorsed a broader application of section 47(a) to lower ranking officials than permitted by *Royer*. The relevant portion of *Copp* reads as follows:

> "The *Royer* decision states that the privilege applies only to communications made 'while exercising policy-making functions.' [Citation.] Similar language is found in [*Sanborn*], *supra*, 18 Cal.3d at page 413, *Kilgore v. Younger* [(1982)] 30 Cal.3d [770,] 781, and [*Neary*], *supra*, 185 Cal.App.3d at page 1143. The *Saroyan* decision, however, speaks more broadly of acts 'in the exercise of an executive function ….' [Citation.] This formulation better reflects the standard in *Barr v. Matteo* [(1959)] 360 U.S. 564[,] which asks whether the communication 'was an

22.

appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively.' [Citation.] It is not necessarily inconsistent with language referring to the 'exercise of policy-making functions' but calls for a broad interpretation of this language to encompass all discretionary acts essential to the proper exercise of an executive function. We regard the language of the *Saroyan* decision as best defining the parameters of the privilege." (*Copp*, *supra*, 45 Cal.App.4th at pp. 843–844.)

Whatever the *Copp* standard is, the reliance upon *Saroyan* and *Barr v. Mateo*, *supra*, 360 U.S. 564 (*Barr*) does not withstand scrutiny. First, *Copp* erroneously characterizes *Barr* as the "leading decision" on the subject. (*Copp*, *supra*, 45 Cal.App.4th at p. 841.) Decided in 1959, *Barr* is a plurality decision by the United States Supreme Court on a question of federal common law. The issue was whether an absolute privilege protecting executive officials from defamation claims, previously recognized for officers of cabinet rank, should be available to other federal officers. An extension of the privilege was held warranted because the privilege is "designed to aid in the effective functioning of government," and important governmental functions do not lose their importance "simply because they are exercised by officers of lower rank in the executive hierarchy." (*Barr*, *supra*, at p. 573.)

The *Barr* decision did not extend the federal privilege to all lower ranking officials. It suggested a case-by-case test based on factors such as "the duties with which the particular officer sought to be made to respond in damages is entrusted" and "the relation of the act complained of to 'matters committed by law to his control or supervision.'" (*Barr*, *supra*, 360 U.S. at p. 573 (plur. opn. of Harlan, J.); see *id*. at p. 578 (dis. opn. of Warren, C.J.) [criticizing plurality for "set[ting] up a vague standard under which no government employee can tell with any certainty whether he will receive absolute immunity for his acts"].) The *Barr* plurality also said, "[T]he occasions upon which the acts of the head of an executive department will be protected by the privilege are doubtless far broader than in the case of an officer with less sweeping functions. But

23.

that is because the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails." (*Barr*, at p. 573 (plur. opn. of Harlan, J.)

Moreover, the *Barr* decision was later supplanted by *Westfall v. Erwin* (1988) 484 U.S. 292 (*Westfall*). The issue in *Westfall* was whether federal executive branch officials "are absolutely immune from liability under state tort law for conduct within the scope of their employment without regard to whether the challenged conduct was discretionary in nature." (*Westfall*, *supra*, 484 U.S. at p. 293.) The United States Supreme Court unanimously held such immunity is not available "unless the challenged conduct is within the outer perimeter of an official's duties *and* is discretionary in nature." (*Id*. at p. 300, italics added.) It is not enough to merely show the person was "acting within the scope of their official duties." (*Id*. at p. 299.) The court declined to articulate "the level of discretion required before immunity may attach," but it made clear the threshold is somewhere beyond "'minimal discretion.'" (*Id*. at pp. 299, 298.) "Conduct by federal officials will often involve the exercise of a modicum of choice and yet be largely unaffected by the prospect of tort liability, making the provision of absolute immunity unnecessary and unwise."[2] (*Westfall*, at p. 298.)

Second, *Copp*'s abstract reliance upon *Saroyan* makes little sense considering *Saroyan* was decided after *Barr* and before *Sanborn*. The *Saroyan* court could have relied on *Barr* to deem section 47(a) applicable to all state and local officials, but instead it followed the Restatement of Torts (and federal cases other than *Barr*) and restricted the

---

[2]The *Westfall* decision was superseded by statute as stated in *United States v. Smith* (1991) 499 U.S. 160, 163. Federal statutory law now "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." (*Osborn v. Haley* (2007) 549 U.S. 225, 229, citing 28 U.S.C. § 2679(b)(1).) However, "*Westfall* remains the [federal] common law rule." (*Beebe v. Washington Metro. Area Transit* (D.C. Cir. 1997) 129 F.3d 1283, 1289; accord, *Midland Psychiatric Associates, Inc. v. U.S.* (8th Cir. 1998) 145 F.3d 1000, 1005 ["It is well established that *Westfall* still articulates the more restrictive federal common-law rule limiting official immunity to discretionary conduct"].) The point being that when the *Copp* opinion was issued in 1996, *Barr* was not the "leading decision" in this area of law. (*Copp*, *supra*, 45 Cal.App.4th at p. 841.)

24.

privilege to "state officials corresponding in rank to federal cabinet members." (*Saroyan*, *supra*, 57 Cal.2d at p. 710.) Missing from *Copp* is an explanation of how the standard applicable to lower ranking officials is to be gleaned from an opinion holding such persons are not entitled to the privilege. And while *Copp* speaks of the need to protect "all discretionary acts essential to the proper exercise of an executive function" (*Copp*, *supra*, 45 Cal.App.4th at p. 844), it fails to recognize that in the context of government immunity, "discretionary acts" are synonymous with "policy decisions." (*Lopez v. Southern Cal. Rapid Transit Dist*. (1985) 40 Cal.3d 780, 793.) "The scope of the discretionary act immunity 'should be no greater than is required to give legislative and executive policymakers sufficient breathing space in which to perform their vital policymaking functions.'" (*Barner v. Leeds* (2000) 24 Cal.4th 676, 685.)

If the California Supreme Court had wanted to apply the broad *Saroyan* standard to all state and local officials, it would have done so in *Sanborn*. The *Sanborn* opinion acknowledges *Saroyan* and *Barr*, referencing the latter case in a "but see" citation and parenthetically emphasizing *Barr* involved "*federal* executive officers." (*Sanborn*, *supra*, 18 Cal.3d at pp. 412–413.) The *Sanborn* court relied not on those cases, but upon *Johnson v. State of California* (1968) 69 Cal.2d 782—a landmark decision on the meaning of "discretionary" conduct for purposes of governmental immunity. (See *Johnson*, at pp. 793–794.) Quoting from *Johnson*, the high court declared "that '[i]mmunity for "discretionary" activities serves no purpose except to assure that courts refuse to pass judgment [on] *policy decisions* in the province of coordinate branches of government.'" (*Sanborn*, at p. 415, italics added.) The key consideration, therefore, was whether the defendant had been "exercising policy-making functions when he defamed plaintiff." (*Sanborn*, at p. 413.)

The *Copp* decision is often cited for its analysis of the distinction between public and private figures, but less so with regard to section 47(a). One of the few published decisions to fully endorse *Copp*'s section 47(a) holding is *Morrow v. Los Angeles Unified*

*School Dist.* (2007) 149 Cal.App.4th 1424, which we discuss, *post*. But even in *Morrow*, the appellate court considered whether the statements at issue were "[related or] unrelated to a legitimate policymaking function." (*Morrow*, at pp. 1442–1443.)

In summary, the California Supreme Court has never held the official duty privilege shields local public officials from defamation liability. Assuming it would conclude such officials may invoke section 47(a), the *Sanborn* decision strongly indicates the privilege would be limited as stated in *Royer* and *Neary*. In other words, protection would be "extended to lower level state or local officials so long as the [defamation occurred] while the official was exercising his [or her] policymaking function and was acting within the scope of his [or her] official duties." (*Neary*, *supra*, 185 Cal.App.3d at p. 1141.) Policymaking functions involve discretionary decisions, so the policymaking requirement is "closely related to the inquiry into whether an official was acting at a planning, as opposed to an operational, level under [Government Code section] 820.2." (*McQuirk v. Donnelley* (9th Cir. 1999) 189 F.3d 793, 801.) Thus, "actions found to be operational for purposes of [Government Code section] 820.2 cannot constitute statements made in the exercise of a policy-making function for purposes of [section] 47(a)." (*Ibid.*; see *Sanborn*, *supra*, 18 Cal.3d. at pp. 412–415.)

## V.     The *Lipman* Case

The trial court gave weight to *Lipman v. Brisbane Elementary Sch. Dist.*, *supra*, 55 Cal.2d 224, and the parties discuss *Lipman* in their briefing. However, *Lipman* was decided before *Saroyan* and years prior to any case considering the application of section 47(a) to local government officials. Because section 47(a) is not mentioned in the opinion, the value of *Lipman* is somewhat limited. We also note *Lipman* was decided prior to the existence of what is now known as the Government Claims Act (Gov. Code, § 810 et seq.). "Since then, the Legislature enacted a comprehensive statutory scheme that wipes the slate clean of common law liabilities and immunities and replaces them

26.

with statutory provisions specifying the extent of [governmental] liability or immunity." (*Leon v. County of Riverside* (2023) 14 Cal.5th 910, 928.)

In *Lipman*, a school superintendent sued a school district and trustees of its governing board for defamation and contractual interference. (*Lipman v. Brisbane Elementary Sch. Dist.*, *supra*, 55 Cal.2d at pp. 228, 232.) The appeal was taken from an order sustaining a demurrer without leave to amend. The opinion summarizes the underlying allegations as to the school district:

> "It is alleged in substance against the district that the three trustees, constituting a majority of the board and acting within the scope of their official duties, maliciously engaged in a course of conduct for the purpose of discrediting plaintiff's reputation and forcing her out of her position. The asserted conduct of the trustees consisted primarily of disparaging statements made by them concerning plaintiff to various persons including district employees attending secret meetings, newspaper reporters and members of the public …." (*Id.* at p. 228.)

The California Supreme Court upheld the judgment for the school district: "The district is immune from tort liability for the alleged acts of the trustees within the scope of their authority, and familiar principles of agency preclude its liability for acts outside the scope of their authority. Accordingly, the complaint does not state a cause of action in tort against the district." (*Lipman v. Brisbane Elementary Sch. Dist.*, *supra*, 55 Cal.2d at p. 230.) The quoted language refers to common law principles now codified in the Government Claims Act. (See, e.g., Gov. Code, §§ 815, 815.2, 820.2.) The school district's immunity for conduct within the trustees' scope of authority was based on the "discretionary" nature of that conduct. (*Lipman*, at pp. 229–230, 233; see Gov. Code § 820.2.)

The judgment was partially reversed as to the individual trustees. Claims of immunity were rejected as to "allegations that the trustees made statements to various persons including newspaper reporters and members of the public to the effect that plaintiff suppressed facts from the board, tampered with minutes of board meetings,

received 'kickbacks' from district employees, engaged in 'shady dealings' and 'cleaned up' on business transactions involving the district." (*Lipman v. Brisbane Elementary Sch. Dist.*, *supra*, 55 Cal.2d at p. 234.) Although the plaintiff was reportedly under formal investigation for suspected wrongdoing, "[t]he statements allegedly made to the press and to members of the public were not confined to reports of charges that were being made; they purported to be statements of fact and were beyond the scope of the trustees' powers." (*Ibid*.) The opinion does not clearly explain why the actionable conduct was "beyond the scope of the trustees' powers," but it suggests the reason was because it occurred outside of the investigatory proceedings. (See *id*. at pp. 233–234.)

## VI.     Thomas's Claims

Arax concedes Thomas and FUSD met their burden of showing the lawsuit arises from protected speech activity (the initial step of the anti-SLAPP analysis). We thus focus on Arax's probability of prevailing on his cause of action. The first issue is whether the evidence demonstrates the applicability of section 47(a) as a matter of law. If it does not, the second issue is whether the evidence shows the absence of malice as a matter of law.

### A.     Section 47(a)

For purposes of this discussion, we assume the protection of section 47(a) is available to lower ranking public officials despite the California Supreme Court never overruling or expressly expanding the holding of *Saroyan*. Under *Royer*, i.e., the first appellate court decision to make this assumption, a defamatory statement by a local public official is absolutely privileged "so long as it is made (a) while exercising policy-making functions, and (b) within the scope of his [or her] official duties." (*Royer*, *supra*, 90 Cal.App.3d at p. 501.) This two-part test is derived from the high court's analysis in *Sanborn*, which was decided more than 14 years after *Saroyan* and with the benefit of *Johnson v. State of California*, *supra*, 69 Cal.2d 782.

Thomas devotes an inordinate portion of her briefing to arguing she acted in her "official capacity" at all relevant times. She repeatedly contends this alleged fact is sufficient to render her statements privileged under section 47(a). Elsewhere she argues the combination of speaking in her official capacity on "a matter of widespread concern" is enough to shield her from liability.

Arax agrees Thomas was acting in her "official capacity" when she made the allegedly defamatory statements. This is alleged in the complaint, and he is presently bound by the allegation. (See *Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1271 ["The admission of fact in a pleading is a 'judicial admission'"].) Arax is deliberately pursuing a narrow theory of liability in order to seek recovery against both Thomas and FUSD. He contends Thomas was acting in her official capacity and "within the course and scope of her agency as a FUSD agent and elected trustee when she defamed [him]," but was *not* exercising a policymaking function.

When he finds it convenient to do so, Arax alleges there are triable issues of fact based upon *FUSD*'s contention that Thomas was not acting in her official capacity or within the scope of her elected position. He also engages in semantic hairsplitting over whether acting within the scope of one's *agency* is the same as acting within the scope of "official duties." Nevertheless, Arax has consistently emphasized—below and on appeal—the need for, and lack of, evidence showing Thomas's statements were part of a policymaking decision.

Thomas's "official capacity" arguments seem designed to distract us from the policymaking issue. In her effort to avoid the issue, she alleges the trial court only considered the capacity in which she appeared on the GV Wire broadcast. The motion ruling says Thomas failed to demonstrate "that the participation in the interview was in her capacity as trustee *or* that specific statements naming plaintiff were privileged." (Italics added.) In any event, we are not bound by the trial court's stated reasons for denying the motion. "If the *decision* of a lower court is correct on any theory of law

applicable to the case, the judgment or order will be affirmed regardless of the correctness of the grounds upon which the lower court reached its conclusion." (*Estate of Beard* (1999) 71 Cal.App.4th 753, 776; accord, *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19.)

The *Sanborn* case shows that acting in an official capacity and within the scope of one's authority is only part of the test. Showing the official is entrusted with policymaking powers is also insufficient. "To be engaged in exercise of his [or her] policymaking function the official must reach a basic policy decision, as distinct from an operational decision, after balancing risks and advantages." (*Neary*, *supra*, 185 Cal.App.3d at p. 1142, citing *Sanborn*, *supra*, 18 Cal.3d at p. 415.) "'The fact that an employee normally engages in "discretionary activity" is irrelevant if, in a given case, the employee did not render a considered decision.'" (*Sanborn*, at p. 415, quoting *Johnson v. State of California*, *supra*, 69 Cal.2d at p. 794, fn. 8.)

In *Sanborn*, the plaintiff "sought the release of approximately $25,400 in attached funds which had been deposited with [the defendant] in his capacity as county clerk. Although [the defendant] had been instructed by a deputy city attorney not to release the funds without a court order, [the defendant] decided that plaintiff's claim on the funds was valid and paid the money to him." (*Sanborn*, *supra*, 18 Cal.3d at p. 410.) After being informed "that he had erred in releasing the funds" and drawing media attention because of his mistake, the clerk defended himself to the press by casting the plaintiff in a negative and defamatory light. (*Ibid.*)

The *Sanborn* defendant's reliance upon section 47(a) was rejected despite the fact his statements were made while "acting within the scope of his employment." (*Sanborn*, *supra*, 18 Cal.3d at pp. 409–410.) We also note the erroneous disbursement of $25,400 (in 1968 dollars) likely constituted a matter of public concern or interest. Indeed, the defamatory statements were made in response to an interview request from the San Francisco Chronicle. (*Sanborn*, *supra*, 18 Cal.3d at p. 410.) Despite those

30.

circumstances, none of the defendant's conduct was viewed as having occurred in the exercise of a policymaking function. (*Id*. at p. 413.)

Thomas does not discuss *Sanborn* in her briefing. She instead relies on *Kilgore v. Younger*, *supra*, 30 Cal.3d 770 and *Morrow v. Los Angeles Unified School Dist*., *supra*, 149 Cal.App.4th 1424. We are not persuaded.

The *Kilgore* defendant was a high-ranking state official (the California Attorney General) who had distributed an official report to the media on the findings of a commissioned study on organized crime. (*Kilgore v. Younger*, *supra*, 30 Cal.3d at p. 774.) The report, which the defendant publicly "adopted," contained allegedly defamatory statements about the plaintiff. (*Id*. at pp. 774–775.) A four-justice majority of the California Supreme Court held the plaintiff's defamation claim was barred by the official duty privilege of section 47(a). (*Kilgore*, at pp. 777–778.)

*Kilgore* was decided five years after *Sanborn* but did not involve a lower ranking state official. The majority opinion states, in relevant part, "The absolute privilege is extended to 'high-ranking state and federal officials, such as the President of the United States, the governor of any state or territory, cabinet officers of the United States and the corresponding officers of any state or territory' [citation] on the rationale that their ability to function would be impaired and society adversely affected if they were not absolutely free of the threat of suit by the defamed seeking recompense for injury." (*Kilgore v. Younger*, *supra*, 30 Cal.3d at p. 778.) We do not view *Kilgore* as helpful to Thomas's position. (See *id*. at p. 781 ["No California case has been brought to our attention which denies to a *high-ranking* state official, such as the Attorney General, immunity from civil liability for publications made in the course of his *policy making functions*," italics added].)

In *Morrow*, the Superintendent of Schools for the Los Angeles Unified School District (superintendent) spoke to the Los Angeles Times about the decision to remove a high school principal from his position. (*Morrow v. Los Angeles Unified School Dist*.,

31.

*supra*, 149 Cal.App.4th at pp. 1429, 1431–1432.)  The statements indicated the principal had responded inadequately to a "series of violent campus disturbances" (*id*. at p. 1430), and that his "handling of the student disturbances had 'accelerated' the decision to replace him" (*id*. at p. 1432).  The principal sued the superintendent for defamation (among other claims), and the superintendent prevailed on an anti-SLAPP motion.  As to the defamation claim, the ruling was upheld on appeal based on section 47(a).

The *Morrow* opinion cites favorably to *Copp* and parrots *Copp*'s reliance upon *Saroyan* and *Barr*, including the erroneous characterization of *Barr* as "the federal Supreme Court's leading decision" on the subject.  (*Morrow v. Los Angeles Unified School Dist*., *supra*, 149 Cal.App.4th at p. 1441; see *id.* at pp. 1440–1441.)  Although the principal argued the superintendent "was not exercising a policymaking function when he made the challenged statements," the *Morrow* court quoted *Copp* for the proposition that "the executive privilege broadly 'encompass[es] all discretionary acts essential to the proper exercise of an executive function' decision."  (*Morrow*, at p. 1442.)  But the opinion never explains what the term "'discretionary acts'" is supposed to mean.  It merely says the superintendent's "statements to the press cannot be deemed ministerial or *unrelated* to a legitimate policymaking function.  Rather, as superintendent he was publicly explaining the district's response to a matter of widespread concern, which was one of his official duties."  (*Morrow*, at pp. 1442–1443, italics added.)

The reasoning in *Morrow* is in tension with *Sanborn*.  (*Morrow v. Los Angeles Unified School Dist*., *supra*, 149 Cal.App.4th at pp. 1442–1443.)  As discussed, *Sanborn* states, "A governmental officer's discussions with the public or press regarding the functioning of his office would seem, instead, to fall within the category of those routine, ministerial duties incident to the normal operations of that office."  (*Sanborn*, *supra*, 18 Cal.3d at p. 415.)  In any event, *Morrow* is distinguishable because the *Morrow* defendant's statements were at least directly related to a policy decision, i.e., the removal of a high school principal from his position.  (See *Caldwell v. Montoya* (1995) 10 Cal.4th

32.

972, 983 [decision to remove a school district's superintendent is a "basic policy decision" to which immunity applies]; *Kemmerer v. County of Fresno* (1988) 200 Cal.App.3d 1426, 1437–1438 [whether to initiate disciplinary proceedings against an employee is a policy decision involving the exercise of discretion], disapproved on other grounds in *Quigley v. Garden Valley Fire Protection Dist*. (2019) 7 Cal.5th 798, 815, fn. 8; cf. *Skinner v. Vacaville Unified School Dist*. (1995) 37 Cal.App.4th 31, 39 [a school board's decision to expel a student "entails 'the resolution of policy considerations … that compels immunity'"].)

The parties' evidence provides very little context for the statements made by Thomas during the GV Wire broadcast. The statements are quoted in isolation, and without any indication of what prompted them. The evidence shows there was a controversial incident at Bullard High School 13 days earlier involving the so-called "KKK photo," but Thomas's statements concerned an alleged incident from nine *years* earlier, in "Summer 2013." There is no evidence of a policy decision made between the photo incident and the GV Wire broadcast to which Thomas's allegedly defamatory statements might relate. (Cf. *Morrow v. Los Angeles Unified School Dist*., *supra*, 149 Cal.App.4th at p. 1442 [defendant, "in his capacity as the chief executive officer of the governing board of the district …, announced the impending transfer of a district employee as part of the school district's response to a notorious crisis in a public high school"].) And there is no evidence Thomas's statements were made while she was "exercising policy-making functions." (*Royer*, *supra*, 90 Cal.App.3d at p. 501.)

"[T]here is no basis for immunizing lower level decisions that merely implement a basic policy already formulated." (*Barner v. Leeds*, *supra*, 24 Cal.4th at p. 685 [discussing discretionary act immunity under Gov. Code, § 820.2].) Arax's declaration indicates FUSD already had antiharassment and antidiscrimination policies that prohibited racist behavior, e.g., the "use of racial slurs and epithets." Insofar as one could infer Thomas's statements were part of a general denouncement of racism within FUSD,

33.

such conduct would seem to fall into the category of operational or ministerial action. Put differently, it would not fall into the category of planning or policymaking. (See *Sanborn*, *supra*, 18 Cal.3d at pp. 413, 415.) Additional evidence would be required to reach a different conclusion.

Thomas attempts to satisfy the *Copp* and *Morrow* standard by arguing her "participation in the GV Wire interview was not unrelated to a legitimate policymaking function" because she was publicly responding "to a matter of widespread concern (the KKK photo controversy)." (See *Morrow v. Los Angeles Unified School Dist.*, *supra*, 149 Cal.App.4th at pp. 1442–1443 [using the phrases "unrelated to a legitimate policymaking function" and "response to a matter of widespread concern"].) Even if we were inclined to follow *Morrow*, Thomas fails to explain the connection between her statements and any policy decisions. The closest she comes is in her reply brief, where she quotes this allegation from the complaint:

> "'At a press conference, preceding Ms. Thomas' May 17, 2022 interview with GV Wire, Ms. Thomas claimed FUSD had historically covered up and ignored past instances of racist behavior at Bullard High School and called for the creation of a special commission to investigate and recommend appropriate remediation measures.'"

Thomas's own declaration more specifically contends, "At the press conference I called for a special commission to investigate FUSD's responses to the May 4, 2022, photograph, and other incidents of racism within FUSD." The quoted statement is the actual evidence, and it raises numerous questions. Upon whom was Thomas calling to create "a special commission to investigate FUSD's responses to … incidents of racism"? Was she calling upon FUSD to investigate itself? Did the FUSD Board of Trustees ever pursue or formally contemplate such action prior to the GV Wire broadcast?

Thomas merely claims to have voiced a suggestion during a press conference, which is quite different from making a formal motion during board proceedings or voting on an agenda item. It is not clear her alleged remarks at the press conference would

34.

qualify as a policy decision. (See generally Ed. Code, §§ 35163 ["Every official action taken by the governing board of every school district shall be affirmed by a formal vote of the members of the board"], 35164 ["The governing board shall act by majority vote of all of the membership constituting the governing board"].) And although defendants want us to *assume* Thomas's statements about Arax were made in direct relation to her "special commission" proposal, the evidence does not clearly establish such a connection.[3]

In sum, Thomas is not a high-ranking government official. The evidence does not establish her allegedly defamatory statements about Arax were made in the exercise of a policymaking function or even in relation to a policy decision. We thus conclude the evidence does not show the applicability of section 47(a) as a matter of law.

### B.      Malice

Arax is seeking compensatory, presumed, and punitive damages. As earlier noted, the latter two require proof of malice regardless of whether he is a public or private figure (assuming the defamation involves a matter of public concern). (*Khawar v. Globe Internat., Inc.*, *supra*, 19 Cal.4th at p. 274.) Thomas and FUSD argued Arax is a public figure in order to have malice deemed an essential element of his claim. The trial court "decline[d] to designate [him] as a limited public figure based on the evidence and arguments submitted with [the motions]." Arax's status was thus left open for future determination. (See Code Civ. Proc., § 425.16, subd. (b)(3); *Mosesian v. McClatchy Newspapers*, *supra*, 233 Cal.App.3d at p. 1694 ["Whether a plaintiff is a public official or public figure is in the first instance a question of law for the trial court to decide"].)

---

[3]During oral argument before this court, Thomas's attorney characterized her statements at the press conference as a call upon FUSD to investigate itself with regard to an alleged history of "cover[ing] up and ignor[ing] past instances of racism." Thomas's attorney also claimed her statements about Arax were "directly related" to her remarks at the press conference and "arguably in defense of that policy."

Although we agree with the trial court's assessment of the evidence it considered, we need not discuss it further because even if the court erred, the error was not prejudicial unless the evidence negated malice as a matter of law. As we now explain, the evidence presents triable issues of fact on the question of malice.

To reiterate, malice in this context means knowledge of falsity or reckless disregard for the truth. (*Khawar v. Globe Internat., Inc.*, *supra*, 19 Cal.4th at p. 275.) "Although at trial a public figure plaintiff must establish actual malice by clear and convincing evidence, in the context of an anti-SLAPP motion the plaintiff must instead establish only a 'probability' that he or she can produce clear and convincing evidence of actual malice." (*Edward v. Ellis* (2021) 72 Cal.App.5th 780, 793; accord, *Collins v. Waters* (2023) 92 Cal.App.5th 70, 80.) As such, the burden is "'not high.'" (*Edward*, at p. 794.)

Malice is provable by circumstantial evidence. (*Reader's Digest Assn. v. Superior Court*, *supra*, 37 Cal.3d at p. 257.) "Factors such as failure to investigate, anger and hostility, and reliance on sources known to be unreliable or biased 'may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication.'" (*Mitchell v. Twin Galaxies, LLC* (2021) 70 Cal.App.5th 207, 221, quoting *Reader's Digest*, at p. 258.) "However, any one of these factors, standing alone, may be insufficient to prove actual malice or raise a triable issue of fact." (*Mitchell*, at p. 221.)

We begin by comparing the statements in question with Thomas's subsequent explanations of her words. During the GV Wire broadcast, she alleged Arax called her middle son the N-word during "football practice," which led her son to decide "he's not playing for Bullard *anymore*." (Italics added.) Thomas also said the incident occurred when her son "was starting high school." Within days of those statements, a GV Wire reporter quoted Thomas as having also said, "'I'm sure my son and his friends who were

36.

*on the team* would be willing to make a statement seeing as they are graduates and he [Arax] is no longer a threat to their education.'" (Italics added.)

The quoted statements are reasonably interpreted as indicating Thomas's middle son was once a Bullard High School student and played football on a Bullard High School team. The last quoted sentence, when read in light of Thomas's subsequent explanations, elicits the question of what team she was talking about and how Arax was a threat to her middle son's education if he never attended the school where Arax taught and coached. In her declaration, Thomas said the incident occurred not when her son "was starting high school," but rather when he "was a student at Tenaya Middle School" and during "a summer football camp." An objective trier of fact could reasonably conclude, upon comparing the statements, that Thomas was deliberately misleading in conveying the impression her middle son had attended Bullard High School and played football on a team coached by Arax. Such a conclusion would in turn be probative of knowledge of falsity, especially given the evidence Arax did not even coach the summer camp. (See *Edward v. Ellis*, *supra*, 72 Cal.App.5th at pp. 973–974 [denial of anti-SLAPP motion supported by evidence raising "credibility questions" about defendant's denial of malicious intent]; *ZL Technologies*, *Inc. v. Does 1-7*, *supra*, 13 Cal.App.5th at p. 632 ["Evidence of falsity will be relevant to any determination of malice"].)

Next, we consider the evidence of Thomas's motives for harming Arax's reputation. Although his alleged use of the N-word reportedly occurred in "Summer 2013," Arax declared that prior to May 2022, Thomas had never confronted him with this accusation. He further declared Thomas met with him in approximately 2019 "to discuss a tutorial program to assist African American students and athletes," but she never said anything to him about her middle son or the N-word. Evidence of an amicable relationship prior to 2021, when Arax alleges Thomas's "animosity" toward him developed, is probative of a malicious motive. (See *Balla v. Hall* (2021) 59 Cal.App.5th 652, 684 ["hostility is relevant if it reflects on the [defendant's] attitude toward the truth

of the statements"]; *Live Oak Publishing Co. v. Cohagan* (1991) 234 Cal.App.3d 1277, 1292 ["evidence of ill will may be circumstantial evidence of actual malice"].)

Arax, who declares himself to be of Armenian descent, alleges a feud of sorts developed between Thomas and Arax's brother in 2021 stemming from "the Arax-family effort to rename Forkner Elementary [School] to H. Roger Tatarian Elementary School." Thomas allegedly acted with "contempt and ridicule" toward the renaming effort, and she allegedly received negative publicity as a result. Thomas's briefing of the malice issue is almost entirely devoted to Arax's contentions about the "Forkner Elementary" dispute.

What Thomas's briefing does not address is the information set forth in paragraph 17 of Arax's sworn declaration. Arax declared as follows:

> "On December 13, 2021, [five months prior to the allegedly defamatory statements,] one [of] my student aids [*sic*] in my class observed and reported an incident concerning Ms. Thomas' youngest son, who is in fact a Bullard High Student unlike [her middle son]. The [youngest son] had inappropriately patted a female student on the rear end at school. As a mandatory reporter, I had to report the incident to the vice-principal, which I did. As I perceived it, this reignited and fueled Ms. Thomas' animosity towards me and directly towards me now. At the time I made the report, I did not know that the student was Ms. Thomas' son, I learned that later."

The above evidence is obviously probative of malice.

Lastly, we observe Thomas has appropriately abandoned her argument below that declaring a reasonable belief in her statements proved a lack of malice. (See *Fisher v. Larsen* (1982) 138 Cal.App.3d 627, 640 ["'The mere profession of a defendant that he believed in good faith that his statements were true does not automatically entitle him to a verdict in his favor'"]; cf. *Stationers Corp. v. Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 421 ["Defendants cannot require a court to accept their *ipse dixit* assertion of good faith, particularly on motion for summary judgment"].) Pursuant to the foregoing analysis, we conclude the parties' evidence does not show the absence of malice as a matter of law.

### C. Trial Court's Rejection of Thomas's Reply Evidence

Thomas argues the trial court abused its discretion by rejecting as untimely various evidence she filed in conjunction with her reply brief. Relying on *RGC Gaslamp*, *LLC v. Ehmcke Sheet Metal Co.*, *Inc.* (2020) 56 Cal.App.5th 413, Thomas says the trial court abused its discretion because the evidence "'was supplemental to evidence submitted in the moving papers [and] not brand new.'" (*Id*. at p. 431.) Arax disagrees.

We need not resolve this dispute because even if Thomas could show error, the claim would fail for lack of prejudice. (See Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1107 [explaining the Cal. Const. "expressly preclude[s] reversal absent prejudice"].) To establish prejudice, Thomas must show "that a different result would have been probable if [the] error … had not occurred." (Code Civ. Proc., § 475.) Put differently, an error is harmless if it is "not reasonably probable [the appellant] would have obtained a more favorable result in its absence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 570.)

Thomas labels the alleged error "prejudicial" but fails to explain how the motion ruling would have been different had the "supplemental" evidence been considered. We address each piece of evidence separately.

#### 1. Minutes of FUSD Board of Trustees Meeting Held May 18, 2022

The disallowed evidence shows the FUSD Board of Trustees formally met one day *after* the GV Wire "Unfiltered" broadcast in which Thomas's allegedly defamatory statements were made. The minutes do not mention the "Unfiltered" program or Thomas's statements about Arax. Thomas alleges the minutes show she "was authorized by FUSD to participate in the GV Wire interview in her official capacity as an FUSD Trustee as part of FUSD's ongoing response to the KKK photo controversy." Thomas further contends the minutes show FUSD ratified her allegedly defamatory statements. Arax's complaint alleges Thomas acted in her "official capacity" and that FUSD

"ratified" her actions, so we fail to see how the evidence would change the anti-SLAPP ruling.

Thomas points to the following statement of the FUSD superintendent regarding either unspecified "racist incidents" that occurred after the controversial photograph incident of May 4, 2022, or the photograph incident itself. (It is unclear which, and also unclear whether the "racist incidents" were national events discussed in prefatory remarks or incidents within FUSD):

> "Conversations and work are continuing this week and will be ongoing. It is critical that every single one of our Fresno Unified staff are with me and our district leadership in denouncing this behavior and standing firm that cultural destructiveness, racism, and hate are NEVER a joke. There is NO room for neutrality from the adults in our system. We cannot and should not minimize this behavior as 'kids being kids'. So, let me be clear, your district leadership and I expect each person employed by Fresno Unified to take any act of racism or cultural destructiveness seriously and to actively interrupt and report this behavior when you see it or hear it. No exceptions."

In essence, the superintendent implored FUSD staff and others to support his denouncement of acts of racism that allegedly occurred in May 2022. All FUSD employees were instructed to take "any act of racism or cultural destructiveness seriously and to actively interrupt and report this behavior when you see it or hear it." The minutes say nothing about media appearances or leveling accusations against staff members regarding events from many years in the past. Thomas does not claim these minutes constitute policymaking evidence, and, moreover, they postdate her appearance on "Unfiltered." If anything, they reinforce the conclusion such media appearances would fall into the category of operational or ministerial actions implementing a preexisting policy—assuming such appearances were in fact authorized.

40.

### 2. Minutes of FUSD Board of Trustees Meeting Held October 13, 2021

Thomas proffered the minutes from a board meeting held seven months prior to the events at issue to show that she voted to change the name of Forkner Elementary School. Arax responds by arguing Thomas made a motion and voted to change the name only to "try and rehabilitate her damaged reputation." The minutes do not reveal what prompted Thomas to support the name change. Regardless, there is additional evidence of malice and the board minutes do not show the absence of malice as a matter of law.

### 3. GV Wire News Article Dated June 13, 2022

On or about June 13, 2022, GV Wire published a written article under the headline, "Bullard Coach Files Defamation Claim Against Trustee in Racial Slur Allegation." The article reports that Arax filed a prelitigation claim (see Gov. Code, § 911.2) seeking damages from FUSD based on Thomas's allegedly defamatory statements during the "Unfiltered" broadcast. The article provides no support for Thomas's anti-SLAPP motion.

### 4. GV Wire News Article Dated June 16, 2022

On or about June 16, 2022, GV Wire published a written article under the headline, "Fresno Trustee Responds to Bullard Coach's Defamation Claim." Although the copy provided by Thomas is partially illegible, the article appears to quote her as saying, in relevant part:

> "[M]y son was heavily sought after from high school coaches. As a Tenaya football team member, he was invited to summer training for incoming freshman at no cost by the way. My son attended training at Bullard and it was at that time in which my son experienced the n-word being used toward players [illegible] home and said he refused to play for Bullard. So Mr. Arax is correct he did not play for him."

Thomas contends the article shows a consistent explanation of her allegedly defamatory statements before and after the filing of Arax's lawsuit. She fails to explain how the trial court's consideration of this evidence would have changed the motion

41.

ruling. We conclude it would not have affected the trial court's decision. Therefore, any error in excluding it was harmless.

## VII.   FUSD's Claims

FUSD maintains it cannot be held liable for Thomas's allegedly defamatory statements. We conclude there are disputed and unresolved factual issues regarding vicarious liability.

"The doctrine of respondeat superior holds an employer liable for torts of its employees committed within the scope of their employment." (*Moreno v. Visser Ranch, Inc*. (2018) 30 Cal.App.5th 568, 575.) "Respondeat superior is based on '"a deeply rooted sentiment"' that it would be unjust for an enterprise to disclaim responsibility for injuries occurring in the course of its characteristic activities," and the doctrine "applies to public and private employers alike." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 208, 209.) Public entities are liable for injuries "proximately caused by an act or omission of an employee of the public entity within the scope of his [or her] employment if the act or omission would [otherwise] have given rise to a cause of action against that employee." (Gov. Code, § 815.2, subd. (a).)

A public "employee" is broadly defined to include "an officer … whether or not compensated …." (Gov. Code, § 810.2.) Government Code section 815.3 establishes special procedural rules for asserting intentional tort claims against elected officials, but it does not apply to defamation. (*Id*., subd. (a).) Defamation claims against an elected official are subject to the general rules set forth in Government Code section 815.2. (See *ibid*.; Haning et al., Cal. Practice Guide: Personal Injury (The Rutter Group 2023) ¶¶ 2:2615, 2:2628, pp. 2(III)-3, 2(III)-6 to 2(III)-7.) FUSD acknowledges Thomas's status as an employee for purposes of this lawsuit.

A plaintiff relying on a theory of respondeat superior has the burden to show the tortfeasor was acting within the scope of his or her employment. (*Moreno v. Visser*

*Ranch, Inc.*, *supra*, 30 Cal.App.5th at p. 576.)  However, the issue is "generally a question of fact, not of law.  [Citations.]  It becomes a question of law that may be resolved on a [dispositive motion] only when 'the facts are undisputed and no conflicting inferences are possible.'"  (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1043 (dis. opn. of Mosk, J.); accord, *Mary M. v. City of Los Angeles*, *supra*, 54 Cal.3d at p. 213.)

FUSD's moving papers argued Thomas acted outside the scope of her employment when she appeared on the GV Wire broadcast, but FUSD produced no evidence to support the assertion.  FUSD continues to make the argument, but it is "axiomatic that the unsworn statements of counsel are not evidence."  (*In re Zeth S.*, *supra*, 31 Cal.4th at p. 413, fn. 11.)  It is one thing to disavow Thomas's actions in a brief; it is quite another for someone like the FUSD superintendent or board president to do it in a sworn declaration.

FUSD relied on two aspects of Bylaw 9005 at the motion hearing, but neither is dispositive of the issue.  One excerpt from Bylaw 9005 reads as follows:

> "Board members may not unilaterally schedule meetings purporting to represent the District in violation of generally accepted Board practices and policies.  Board members shall not unilaterally attend internal staff meetings or meetings between administration and third parties unless invited by District or site administration, or authorized by the superintendent or by action of the Board."

It was suggested at the motion hearing and in the trial court's ruling that Thomas's appearance on the "Unfiltered" program was arguably a "meeting" scheduled in violation of the above rule.  FUSD cites the rule again in its opening brief.  However, elsewhere in Bylaw 9005 it explains this rule concerns the FUSD Board of Trustees' "interact[ion] with District administration," and is designed to help "maintain effective management and clarity of roles."  GV Wire is a third-party media entity, not part of the "District

43.

administration." When read in context, the rule's relevance to the "Unfiltered" broadcast seems doubtful.[4]

FUSD also relies on a section of Bylaw 9005 requiring board members to "[r]efrain from rude or abusive conduct, *personal attacks*, *or verbal attacks upon the character* or motives of other Board members, *District employees*, or members of the public." (Italics added.) It appears Thomas violated this bylaw when she made her accusations against Arax during the "Unfiltered" program. However, an employee's violation of rules does not necessarily prove he or she was acting outside the scope of their employment.

"California has adopted the rationale that the employer's liability should extend beyond his actual or possible control over the employees to include risks inherent in or created by the enterprise …." (*Rodgers v. Kemper Constr. Co.* (1975) 50 Cal.App.3d 608, 618.) "'A risk arises out of the employment when "*in the context of the particular enterprise* an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business."'" (*Farmers Ins. Group v. County of Santa Clara*, *supra*, 11 Cal.4th at p. 1003, quoting *Perez v. Van Groningen & Sons*, *Inc*. (1986) 41 Cal.3d 962, 968.) Accordingly, "an employee's tortious act may be within the scope of employment even if it contravenes an express company rule and confers no benefit to the employer." (*Farmers Ins. Group*, at p. 1004.) However, the employer "will not be held vicariously liable for an employee's malicious or tortious conduct if the employee *substantially* deviates from the employment duties for personal purposes." (*Id*. at p. 1005; e.g., *Perry v. County of Fresno* (2013) 215

---

[4]The rule would be relevant to Thomas's presence at the Bullard High School staff meeting on May 6, 2022, which Arax has described as "highly irregular." In a supplemental declaration, Thomas claimed she was invited to the meeting by an unnamed "Bullard High School staff member" and attended "after informing Superintendent Robert Nelson of [her] intent to do so."

Cal.App.4th 94, 98–100, 105 [employee's criminal and tortious conduct "was a personal endeavor that was totally unrelated to his job"].)

In *Perez*, the employer had "a company rule [that] forbade anyone but the driver" to ride on its tractors. (*Perez v. Van Groningen & Sons, Inc.*, *supra*, 41 Cal.3d at p. 965.) An employee violated the rule by operating a tractor with a passenger on board. The passenger fell from the tractor, sustaining grave injuries, and the employer was held liable for the employee's negligence. Whether the employee acted in the scope of his employment was a question of fact decided against the employer by a jury, and the California Supreme Court upheld the judgment. Although the employee violated a rule, he "was clearly performing an assigned task of the employer." (*Id.* at p. 970.) "The presence of an unauthorized passenger was insufficient to take [the employee] outside the scope of his employment since he was still carrying out his employer's business." (*Ibid.*) In short, *Perez* holds "proof of an employer's authorization of his employee's act is not necessary to show that the act was within the scope of employment." (*Id.* at p. 969.)

To fall within the scope of employment, the employee's conduct "must be 'an "outgrowth" of the employment' and the risk of tortious injury must be ""inherent in the working environment"" or ""typical of or broadly incidental to the enterprise [the employer] has undertaken."""" (*Daza v. Los Angeles Community College Dist.* (2016) 247 Cal.App.4th 260, 268.) When determining this issue, the trier of fact may consider "whether the conduct benefited the employer, whether it was authorized or directed by the employer, the reasonable expectations of the employer, the amount of freedom the employee has to perform the duties of the job, the type of work the employee was hired to do, the nature of the conduct involved, and the time and place of the [tortious behavior]." (*Tognazzini v. San Luis Coastal Unified School Dist.* (2001) 86 Cal.App.4th 1053, 1058.) "Acts that do not benefit the employer may nonetheless fall within the scope of employment." (*Farmers Ins. Group v. County of Santa Clara*, *supra*, 11 Cal.4th at p. 1042.) On the other hand, "vicarious liability is inappropriate when an employee's

misconduct does not arise from the conduct of the employer's enterprise, but instead arises from a personal dispute." (*Kephart v. Genuity*, *Inc*. (2006) 136 Cal.App.4th 280, 292; see *Perry v. County of Fresno*, *supra*, 215 Cal.App.4th at p. 102.)

Turning to the evidence, Thomas's declaration confirms she appeared and spoke at an FUSD press conference on May 9, 2022, regarding the controversial photograph incident from five days earlier. This indicates that public speaking appearances outside of board meetings are generally within the scope of her employment. The press conference related to an incident at Bullard High School. Although Thomas does not represent the region in which Bullard is located, she was permitted to speak about the controversy during the press conference. Such permission is reasonably inferable by the presence of the superintendent and additional board members at the same event.

Thomas appeared on the "Unfiltered" program on May 17, 2022, and spoke publicly on the advertised topic of "Bullard High and Racism in Fresno Unified." Given her speaking role at the press conference eight days earlier on basically the same topic, it is an unresolved question of fact whether her "Unfiltered" appearance was within the scope of her employment. Thomas has declared she appeared in her "capacity as an FUSD [t]rustee to discuss the history of racism at Bullard High School, [her] alma mater, given the May 4, 2022, photograph, and corresponding public outcry."

FUSD argues Thomas made her accusations against Arax for "'purely personal'" reasons unconnected to, i.e., not arising from, her employment. There are two problems with the argument. First, the appearance on "Unfiltered" was not entirely unconnected to Thomas's position as an FUSD trustee. She was invited on the show to speak about "Racism in Fresno Unified," not about plaintiff Arax, and she has attested to discussing "specific incidences of racism within FUSD and Bullard High School, including the May 4, 2022, photograph," during the broadcast. Second, FUSD's argument seems to impliedly assume Thomas acted with malice. Thomas has attested to believing her statements were true, which presents issues of fact as to why she made them. Whether

46.

she genuinely believed the accusation is closely tied to the question whether her conduct "*substantially* deviate[d] from the employment duties for personal purposes." (*Farmers Ins. Group v. County of Santa Clara*, *supra*, 11 Cal.4th at p. 1005.)

The *Sanborn* case involved an analogous scenario. In addition to suing the clerk for defamation, the *Sanborn* plaintiff also sued the city pursuant to a respondeat superior theory. (*Sanborn*, *supra*, 18 Cal.3d at pp. 410–411.) As discussed, the clerk erroneously released $25,400 in attached funds to the plaintiff and subsequently granted a press interview in which he defamed the plaintiff while attempting to defend and excuse his mistake. A jury concluded the clerk acted within the scope of his employment, but on appeal the city "insist[ed] that the sole purpose of the statement in question was for [the clerk's] personal advantage and gain." (*Id*. at p. 412.) The California Supreme Court rejected the argument:

> "[W]e cannot presume as a matter of law that the statements were of no conceivable benefit to the City, or that their object was *solely* to save [the clerk] from personal embarrassment. The jury reasonably could have concluded that responses to press inquiry constituted, as to time, place, and circumstance, responses of a public official regarding his administration of a public office and thus was within the scope of his public employment. An important public purpose is served both by the press inquiry and by the official's response. We conclude, accordingly, that the statement was made within the ambit of [the clerk's] public employment, and that his principal, City, is liable therefor in the absence of other defenses." (*Ibid*.)

Finally, there are factual issues regarding foreseeability, authorization, and ratification. Was the risk that Thomas might defame Arax really "so unusual or startling"? (*Perez v. Van Groningen & Sons, Inc*., *supra*, 41 Cal.3d at p. 968.) There is evidence Thomas attended a staff meeting on May 6, 2022, and openly accused unnamed "'white' Bullard High School coaches of using the 'N-word' on campus." While this may have violated the bylaw prohibiting verbal attacks on the character of FUSD employees, there is no evidence Thomas was admonished or disciplined for her remarks. Three days later, Thomas spoke at a press conference and reportedly "stated that Bullard

High School, and specifically certain [unnamed] members of its staff were racist against African American students." The superintendent was present for this second arguable violation of Bylaw 9005, but again there is no indication FUSD leadership had any problem with her making such accusations. There is likewise no indication FUSD's leadership disapproved of Thomas personally attacking Arax during the "Unfiltered" broadcast.

The evidence presented to the trial court did not show Thomas's allegedly defamatory statements were made outside the scope of her employment as a matter of law. FUSD's remaining arguments concern section 47(a), and they fail for the reasons given above regarding Thomas's claims. We will, however, discuss one more case not cited in Thomas's briefing but relied upon by FUSD: *Maranatha Corrections, LLC v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1075 (*Maranatha*).

The *Maranatha* case involved a libel claim against the director of the California Department of Corrections and Rehabilitation (CDCR), the CDCR itself, and the State of California. (*Maranatha*, *supra*, 158 Cal.App.4th at pp. 1079–1080.) The allegedly libelous statements constituted the reasons given for the CDCR's termination of a contractual relationship with a private contractor, and they were made in an official letter notifying the contractor of the CDCR's decision. The contractor sued based on the CDCR director's release of the letter to the press. (*Id*. at pp. 1079, 1081–1082.)

The *Maranatha* defendants prevailed on an anti-SLAPP motion, and the Third Appellate District upheld the ruling based on *Saroyan*, *Kilgore v. Younger*, *supra*, 30 Cal.3d 770, and *Morrow v. Los Angeles Unified School Dist.*, *supra*, 149 Cal.App.4th 1424, among other cases. The CDCR's termination of its relationship with the contractor was a policy decision, i.e., "the result of careful consideration of an important issue by a policymaking agency head of state government." (*Maranatha*, *supra*, 158 Cal.App.4th at p. 1089.) The CDCR director's release of the letter to the press was done "in defense of a policy decision she made." (*Id*. at p. 1088.) In the present matter, as we have discussed,

48.

the parties' anti-SLAPP evidence establishes neither an analogous policymaking decision by Thomas nor a direct connection between such a decision and her statements about Arax.

## DISPOSITION

The orders from which the appeals are taken are affirmed. Plaintiff shall recover his costs on appeal.

PEÑA, Acting P. J.

WE CONCUR:

SMITH, J.

SNAUFFER, J.